Exhibit "B"



**200504180071718**
Pgs: 57  $468.00    T2005002 9295
04/18/2005 1:01PM  BXLAND AND MO
Robert G. Montgomery
Franklin County Recorder

**CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED
PARTNERSHIP**, as mortgagor
(Borrower)

to

**LEHMAN BROTHERS BANK, FSB**, as mortgagee
(Lender)

---

**OPEN-END MORTGAGE AND SECURITY AGREEMENT
IN THE MAXIMUM AMOUNT OF $3,925,000.00**

---

Date:  April 7, 2005

Location:  Columbus, Ohio

County:  Franklin

PREPARED BY AND UPON
RECORDATION RETURN TO:

STROOCK & STROOCK & LAVAN LLP
180 MAIDEN LANE
NEW YORK, NY 10038
ATTN: PATRICK MYERS

SSL-DOCS1 1537917v2

# TABLE OF CONTENTS

1.  **GRANTS OF SECURITY** ..................................................................................................1

    1.1     PROPERTY MORTGAGED ...................................................................................1
    1.2     ASSIGNMENT OF RENTS ...................................................................................2
    1.3     SECURITY AGREEMENT ...................................................................................2
    1.4     PLEDGE OF MONIES HELD...............................................................................3

2.  **DEBT AND OBLIGATIONS SECURED** .....................................................................3

    2.1     DEBT AND OBLIGATIONS SECURED ...........................................................3

3.  **BORROWER COVENANTS**...........................................................................................4

    3.1     PAYMENT OF DEBT .........................................................................................4
    3.2     INSURANCE..........................................................................................................4
    3.3     PAYMENT OF TAXES, ETC ..............................................................................7
    3.4     RESERVES...........................................................................................................7
    3.5     CONDEMNATION ...............................................................................................7
    3.6     LEASES AND RENTS .........................................................................................8
    3.7     MAINTENANCE OF PROPERTY ......................................................................9
    3.8     WASTE .................................................................................................................9
    3.9     COMPLIANCE WITH LAWS ...........................................................................10
    3.10    BOOKS AND RECORDS ..................................................................................10
    3.11    PAYMENT FOR LABOR AND MATERIALS ..................................................11
    3.12    MANAGEMENT .................................................................................................11
    3.13    PERFORMANCE OF OTHER AGREEMENTS ...............................................11
    3.14    CHANGE OF NAME, IDENTITY OR STRUCTURE ......................................11
    3.15    EXISTENCE .......................................................................................................11
    3.16    OFAC ..................................................................................................................12

4.  **SPECIAL COVENANTS**................................................................................................12

    4.1     PROPERTY USE ................................................................................................12
    4.2     SINGLE PURPOSE ENTITY .............................................................................12
    4.3     RESTORATION ..................................................................................................13
    4.4     LOCK-BOX ACCOUNT .....................................................................................16

5.  **REPRESENTATIONS AND WARRANTIES**..............................................................17

    5.1     WARRANTY OF TITLE.....................................................................................17
    5.2     AUTHORITY.......................................................................................................17
    5.3     LEGAL STATUS AND AUTHORITY ...............................................................17
    5.4     VALIDITY OF DOCUMENTS...........................................................................18
    5.5     LITIGATION ......................................................................................................18
    5.6     STATUS OF PROPERTY ...................................................................................18
    5.7     NO FOREIGN PERSON.....................................................................................19
    5.8     SEPARATE TAX LOT........................................................................................19
    5.9     ERISA COMPLIANCE .......................................................................................19
    5.10    LEASES ..............................................................................................................19

| 5.11 | FINANCIAL CONDITION | 19 |
| 5.12 | BUSINESS PURPOSES | 19 |
| 5.13 | TAXES | 19 |
| 5.14 | MAILING ADDRESS | 19 |
| 5.15 | NO CHANGE IN FACTS OR CIRCUMSTANCES | 19 |
| 5.16 | DISCLOSURE | 20 |
| 5.17 | THIRD PARTY REPRESENTATIONS | 20 |
| 5.18 | ILLEGAL ACTIVITY | 20 |
| 5.19 | OFAC | 20 |
| 5.20 | PROPERTY DOCUMENTS | 20 |

| 6. | OBLIGATIONS AND RELIANCES | 21 |
| 6.1 | RELATIONSHIP OF BORROWER AND LENDER | 21 |
| 6.2 | NO LENDER OBLIGATIONS | 21 |

| 7. | FURTHER ASSURANCES | 21 |
| 7.1 | RECORDING OF SECURITY INSTRUMENT, ETC | 21 |
| 7.2 | FURTHER ACTS, ETC | 21 |
| 7.3 | CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS | 22 |
| 7.4 | ESTOPPEL CERTIFICATES | 22 |
| 7.5 | REPLACEMENT DOCUMENTS | 22 |

| 8. | DUE ON SALE/ENCUMBRANCE | 22 |
| 8.1 | LENDER RELIANCE | 22 |
| 8.2 | NO SALE/ENCUMBRANCE | 22 |
| 8.3 | SALE/ENCUMBRANCE DEFINED | 23 |
| 8.4 | LENDER'S RIGHTS | 24 |

| 9. | DEFAULT | 24 |
| 9.1 | EVENTS OF DEFAULT | 24 |

| 10. | RIGHTS AND REMEDIES | 26 |
| 10.1 | REMEDIES | 26 |
| 10.2 | APPLICATION OF PROCEEDS | 27 |
| 10.3 | RIGHT TO CURE DEFAULTS | 27 |
| 10.4 | ACTIONS AND PROCEEDINGS | 27 |
| 10.5 | RECOVERY OF SUMS REQUIRED TO BE PAID | 27 |
| 10.6 | EXAMINATION OF BOOKS AND RECORDS | 27 |
| 10.7 | OTHER RIGHTS, ETC | 28 |
| 10.8 | RIGHT TO RELEASE ANY PORTION OF THE PROPERTY | 28 |
| 10.9 | INTENTIONALLY DELETED | 28 |
| 10.10 | RECOURSE AND CHOICE OF REMEDIES | 28 |
| 10.11 | RIGHT OF ENTRY | 29 |
| 10.12 | DEFAULT INTEREST AND LATE CHARGES | 29 |

| 11. | INDEMNIFICATION | 29 |

-ii-

|        | 11.1 | GENERAL INDEMNIFICATION | 29 |
|        | 11.2 | MORTGAGE AND/OR INTANGIBLE TAX | 29 |
|        | 11.3 | ERISA INDEMNIFICATION | 30 |
|        | 11.4 | DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES | 30 |
| **12.** | **WAIVERS** | | **30** |
|        | 12.1 | WAIVER OF COUNTERCLAIM | 30 |
|        | 12.2 | MARSHALLING AND OTHER MATTERS | 30 |
|        | 12.3 | WAIVER OF NOTICE | 30 |
|        | 12.4 | SOLE DISCRETION OF LENDER | 30 |
|        | 12.5 | SURVIVAL | 31 |
|        | 12.6 | WAIVER OF TRIAL BY JURY | 31 |
| **13.** | **EXCULPATION** | | **31** |
|        | 13.1 | EXCULPATION | 31 |
|        | 13.2 | RESERVATION OF CERTAIN RIGHTS | 31 |
|        | 13.3 | EXCEPTIONS TO EXCULPATION | 32 |
|        | 13.4 | RECOURSE | 32 |
|        | 13.5 | BANKRUPTCY CLAIMS | 32 |
| **14.** | **NOTICES** | | **32** |
|        | 14.1 | NOTICES | 32 |
| **15.** | **APPLICABLE LAW** | | **33** |
|        | 15.1 | CHOICE OF LAW | 33 |
|        | 15.2 | USURY LAWS | 33 |
|        | 15.3 | PROVISIONS SUBJECT TO APPLICABLE LAW | 33 |
| **16.** | **SECONDARY MARKET** | | **33** |
|        | 16.1 | TRANSFER OF LOAN | 33 |
|        | 16.2 | REPLACEMENT OF LOAN | 34 |
|        | 16.3 | RE-ALLOCATION OF LOAN | 34 |
|        | 16.4 | CONSOLIDATION OF LOAN | 34 |
| **17.** | **COSTS** | | **34** |
|        | 17.1 | PERFORMANCE AT BORROWER'S EXPENSE | 34 |
|        | 17.2 | ATTORNEY'S FEES FOR ENFORCEMENT | 35 |
| **18.** | **DEFINITIONS** | | **35** |
|        | 18.1 | GENERAL DEFINITIONS | 35 |
| **19.** | **MISCELLANEOUS PROVISIONS** | | **35** |
|        | 19.1 | NO ORAL CHANGE | 35 |
|        | 19.2 | LIABILITY | 35 |

-iii-

| | | |
|---|---|---|
| 19.3 | INAPPLICABLE PROVISIONS | 35 |
| 19.4 | HEADINGS, ETC. | 35 |
| 19.5 | DUPLICATE ORIGINALS; COUNTERPARTS | 36 |
| 19.6 | NUMBER AND GENDER | 36 |
| 19.7 | SUBROGATION | 36 |
| 19.8 | ENTIRE AGREEMENT | 36 |
| **20.** | **INTENTIONALLY DELETED** | **36** |
| **21.** | **STATE SPECIFIC PROVISIONS** | **36** |
| 21.1 | OPEN-END MORTGAGE MAXIMUM PRINCIPAL AMOUNT | 36 |
| 21.2 | OHIO REMEDIES | 36 |
| 21.3 | CONFLICTING PROVISIONS | 36 |
| **22.** | **CROSS-DEFAULT** | **37** |
| 22.1 | CROSS-DEFAULT OF NOTE A AND NOTE B | 37 |
| 22.2 | DEBT SECURED | 37 |

-iv-

**THIS OPEN-END MORTGAGE AND SECURITY AGREEMENT** (this "Security Instrument") is made as of the 7th day of April, 2005, by **CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED PARTNERSHIP**, a Delaware limited partnership, having its principal place of business at 270 Commerce Drive, Rochester, New York 14623, s mortgagor ("Borrower") to **LEHMAN BROTHERS BANK, FSB**, a federal stock savings bank, having an address at 1000 West Street, Suite 200, Wilmington, Delaware 19801, as mortgagee ("Lender").

## RECITALS

Borrower is indebted to Lender by its Promissory Note A of even date herewith given to Lender in the principal sum of THREE MILLION SIX HUNDRED NINETY FIVE THOUSAND AND 00/100 DOLLARS ($3,695,000.00) in lawful money of the United States of America (together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as "Note A"), and by its Promissory Note B of even date herewith given to Lender in the principal sum of TWO HUNDRED THIRTY THOUSAND AND 00/100 DOLLARS ($230,000.00) in lawful money of the United States of America (together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as "Note B"; Note A and Note B shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note.

The maturity date of the Note is April 11, 2020.

Borrower desires to secure the payment and performance of the Obligations (as defined in Section 2.1 hereof).

## 1. GRANTS OF SECURITY

1.1 PROPERTY MORTGAGED. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Lender, and grant a security interest to Lender in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "Property"): (a) the real property described in Exhibit A attached hereto and made a part hereof (the "Land"); (b) all additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument; (c) the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements"); (d) all easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto; (e) all furnishings, machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or

SSL-DOCS1 1537917v2

usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above; (f) all leases and other agreements affecting the use, enjoyment or occupancy of the Land and the Improvements heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. § 101 et seq., as the same may be amended from time to time (the "Bankruptcy Code") (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues (including, but not limited to, any payments made by tenants under the Leases in connection with the termination of any Lease), issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt (as hereinafter defined); (g) any and all lease guaranties, letters of credit and any other credit support (individually, a "Lease Guaranty" and collectively, the "Lease Guaranties") given by any guarantor in connection with any of the Leases (individually, a "Lease Guarantor" and collectively, the "Lease Guarantors"); (h) all rights, powers, privileges, options and other benefits of Borrower as lessor under the Leases and beneficiary under all Lease Guaranties; (i) all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property; (j) all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property; (k) all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction; (l) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims; (m) the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property; (n) all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder; (o) all tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; and (p) any and all other rights of Borrower in and to the items set forth in Subsections (a) through (o) above.

1.2 <u>ASSIGNMENT OF RENTS</u>.  Borrower hereby absolutely and unconditionally assigns to Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of this Section 1.2 and Section 3.6, Lender grants to Borrower a revocable license to collect and receive the Rents, which license shall be automatically revoked upon the occurrence of an Event of Default (as hereinafter defined).  Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

1.3 <u>SECURITY AGREEMENT</u>.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and

-2-

personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations, a security interest in the Property to the full extent that the Property may be subject to the Uniform Commercial Code.

1.4 <u>PLEDGE OF MONIES HELD</u>. Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (as defined in Section 3.4), the Deferred Maintenance Deposit (as defined on <u>Exhibit B</u> attached hereto and made a part hereof), the Reserve (as defined on <u>Exhibit B</u>), Net Proceeds (as defined in Section 4.3), the Lock-Box Account (as defined in Section 4.4) and condemnation awards or payments described in Section 3.5 (collectively, "Deposits"), as additional security for the Obligations until expended or applied as provided in this Security Instrument.

CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender, and the successors and assigns of Lender, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note and this Security Instrument, shall well and truly perform the Other Obligations (as defined in Section 2.1 hereof) as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, these presents and the estate hereby granted shall cease, terminate and be void.

2. <u>DEBT AND OBLIGATIONS SECURED</u>

2.1 <u>DEBT AND OBLIGATIONS SECURED</u>. This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the payment of the Debt and the performance of the Other Obligations, in such order of priority as Lender may determine in its sole discretion. For purposes hereof, the term "Debt" shall mean the aggregate of the indebtedness evidenced by the Note and interest in lawful money of the United States of America, interest, default interest, late charges, prepayment premiums and other sums, as provided in the Note, this Security Instrument or the other Loan Documents (defined below), all other moneys agreed or provided to be paid by Borrower in the Note, this Security Instrument or the other Loan Documents and all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby. For purposes hereof, the term "Other Obligations" shall mean the obligations of Borrower (other than the obligation to repay the Debt) contained in this Security Instrument, the Note and the other Loan Documents (as hereinafter defined) as permitted by Ohio Revised Code Section 5301.233. For purposes hereof, the term "Loan Documents" shall mean the Note, this Security Instrument and any other documents or instruments which now or shall hereafter wholly or partially secure or guarantee payment of the Note or which have otherwise been executed or are hereafter executed by Borrower and/or any other person or entity in connection with the loan (the "Loan") evidenced by the Note and any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part thereof. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively below as the "Obligations." All the covenants, conditions and agreements contained in the Note and the other Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Anything to the contrary herein or in any other Loan Document notwithstanding, the obligations of any guarantor under the Guaranty of Recourse Obligations of Borrower or any Guarantor or Indemnitor under any other separate guaranty or indemnity accepted by Lender shall not be secured by this Security Instrument, any separate assignment of leases or assignment of rents, or any other lien encumbering the Property; provided however that the obligations of Borrower under the Environmental Indemnity Agreement and under any separate indemnity of Borrower shall be so secured, subject to the rights of Lender to proceed on an unsecured basis thereunder pursuant to applicable law.

-3-

## 3. BORROWER COVENANTS

Borrower covenants and agrees that:

3.1 PAYMENT OF DEBT.  Borrower will pay the Debt at the time and in the manner provided in the Note, this Security Instrument and the other Loan Documents.

3.2 INSURANCE.

(a)     Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the coverages set forth herein:

(i)     comprehensive all risk insurance on the Improvements and the Personal Property, in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Security Instrument shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing either an agreed amount endorsement or a waiver of all co-insurance provisions; (C) providing for a deductible of not greater than $25,000; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, Borrower shall obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement, which shall include sufficient coverage for (1) costs to comply with building and zoning codes and ordinances, (2) demolition costs, and (3) increased costs of construction.   If any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", Borrower shall obtain flood hazard insurance in such an amount as Lender shall require, but in no event less than the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.  In addition, in the event the Property is located in the State of California or in a "seismic zone" 3 or 4 (as defined in the Uniform Building Code published by the International Conference of Building Officials), Borrower shall obtain earthquake insurance in amounts and in form and substance satisfactory to Lender;

(ii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the "occurrence" form with a combined single limit (including "umbrella" coverage in place) of not less than (1) $3,000,000 and a general aggregate limit of not less than $4,000,000; or (2) if any of the Improvements contain elevators, a combined single limit of not less than $5,000,000 and a general aggregate limit of $6,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all written and oral contracts, to the extent the same is available;

(b)     business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in Subsection 3.2(a)(i); (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date of the loss, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; (D) in an amount equal to 100% of the projected gross income from the Property for a period of twelve (12) months; and (E) if Borrower is required to obtain an "Ordinance or Law Coverage" or "Enforcement" endorsement pursuant to Subsection 3.2(a)(i)(D), coverage for the increased period of restoration.   The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate

-4-

of the gross income from the Property for the succeeding twelve (12) month period. All insurance proceeds payable to Lender pursuant to this Subsection shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such business income insurance. Notwithstanding the foregoing, provided no Event of Default shall have occurred, Lender shall within twenty (20) days of Borrower's request therefore, disburse to Borrower the proceeds from such business income insurance actually received by Lender to the extent necessary to pay normal and customary operating expenses of the Property, less an amount sufficient to pay the monthly debt service payments next due under Note A and Note B. Further, provided no Event of Default shall have occurred and be continuing, after the ratio of sustainable net operating income for the Property to debt service payable under the Note has been restored to at least 1.20 to 1.00, all remaining proceeds from such business income insurance actually received by Lender shall be returned to Borrower within twenty (20) days of Borrower's request therefore;

      (i)     (A) at all times during which structural construction, material repairs or alterations are being made with respect to the Improvements, owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) during new construction, the insurance provided for in Subsection 3.2(a)(i) written in a so-called builder's risk completed value form on a non-reporting basis;

      (ii)     if Borrower has employees, workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000 per accident and per disease per employee, and $1,000,000 aggregate coverage for disease in respect of any work or operations on or about the Property, or in connection with the Property or its operation;

      (iii)     if the Property contains HVAC or other equipment not covered by the comprehensive all risk insurance, comprehensive boiler and machinery insurance, in amounts as shall be reasonably required by Lender;

      (iv)     if Borrower owns or operates motor vehicles, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits reasonably acceptable to Lender; and

      (v)     such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

      (c)     All insurance provided for in Subsection 3.2(a) hereof shall be obtained under valid and enforceable policies (the "Policies" or in the singular, the "Policy"), and shall be subject to the reasonable approval of Lender as to insurance companies, policy limits and any sub-limits thereof, forms (including exclusions and exceptions), deductibles, loss payees and insureds. The insurance companies must be approved, authorized or licensed to provide insurance in the state in which the Property is located and have a rating of "A" or better for claims paying ability assigned by Moody's Investors Service, Inc. and Standard & Poor's Rating Group or a general policy rating of "A-" or better and a financial class of VIII or better assigned by A.M. Best Company, Inc. Each such insurer shall be referred to herein as a "Qualified Insurer".

      (d)     Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender (which approval shall not be unreasonably withheld or delayed) and Lender's interest is included therein as provided in this Security Instrument and such

-5-

Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Subsection 3.2(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Subsection 3.2(e). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Subsection 3.2(a).

(c)     All Policies of insurance provided for or contemplated by Subsection 3.2(a), except for the Policy referenced in Subsection 3.2(a)(v), shall name Lender and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a "mortgagee clause" in form acceptable to Lender providing, among other things, that Lender shall receive at least thirty (30) days prior written notification of any termination, cancellation or reduction of insurance and that the loss thereunder shall be payable to Lender.

(f)     If not previously delivered to Lender, Borrower shall deliver to Lender no later than fifteen (15) days after the date hereof certified copies of the existing Policies providing the insurance coverage required under Section 3.2(a) marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums") annually in advance. In addition, no later than fifteen (15) days prior to the expiration dates of the Policies which Borrower is now or hereafter required to maintain hereunder, Borrower shall deliver to Lender certified copies of new or renewal Policies (also marked "premium paid" or accompanied by evidence satisfactory to Lender of payment of the Insurance Premiums due thereunder annually in advance), together with certificates of insurance therefor, setting forth, among other things, the amounts of insurance maintained, the risks covered by such insurance and the insurance company or companies which carry such insurance. If requested by Lender, Borrower shall furnish verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender. Under no circumstances shall Borrower be permitted to finance the payment of any portion of the Insurance Premiums.

(g)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right to take such action as Lender reasonably deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its reasonable discretion deems appropriate, and all reasonable expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by this Security Instrument and shall bear interest in accordance with Section 10.3 hereof. Lender shall endeavor to provide Borrower with notice at the time Lender takes any action pursuant to the foregoing sentence.

(h)     If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by Lender (the "Restoration") and otherwise in accordance with Section 4.3 of this Security Instrument, except in instances where Lender has failed or elected not to disburse Net Proceeds to Borrower under such Section 4.3 (provided that such exception shall not apply if the failure to disburse is attributable to Borrower's failure to comply with the conditions set forth in Clauses (A), (D) or (I) of Subsection 4.3(b)(i) or in Subsection 4.3(b)(ii) or any other conditions set forth in Section 4.3 which Borrower has the practical ability to satisfy). Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.

(i)     In the event of foreclosure of this Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to such

-6-

policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

3.3 <u>PAYMENT OF TAXES, ETC</u>. Borrower shall promptly pay all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges, including without limitation vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes"), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property prior to the time same become delinquent. Borrower will deliver to Lender, promptly upon Lender's written request, evidence reasonably satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property. Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

3.4 <u>RESERVES</u>. (a) Borrower shall pay to Lender on each date that a regularly scheduled payment of principal or interest is due under the Note (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has obtained knowledge and authorizes Lender or its agent to obtain the bills for Taxes and Other Charges directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Lender will apply the Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.2 and 3.3 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.2 and 3.3 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. No earnings or interest on the Escrow Fund shall be payable to Borrower.

(b) Borrower shall comply with the Replacement and Leasing Reserve Requirements set forth on <u>Exhibit B</u> attached hereto and made a part hereof.

3.5 <u>CONDEMNATION</u>. Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or

-7-

discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property if Lender shall make the award available to Borrower pursuant to the terms thereof, and otherwise comply with the provisions of Section 4.3 of this Security Instrument. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.

  3.6 <u>LEASES AND RENTS</u>. (a) Except as otherwise consented to by Lender, all Leases shall be written on the standard form of lease which shall have been approved by Lender. Upon request, Borrower shall furnish Lender with executed copies of all Leases. No material changes may be made to the Lender-approved standard lease without the prior written consent of Lender, which approval shall not be unreasonably withheld or delayed. In addition, all renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to existing local market rates and terms and shall be arms-length transactions with bona fide, independent third party tenants. All proposed leases and renewals of existing Leases, other than Minor Leases (hereinafter defined), shall be subject to the prior approval of Lender and its counsel, at Borrower's expense, which approval shall not be unreasonably withheld or delayed if the proposed Lease or renewal Lease (i) is on the Lender-approved form, subject only to commercially reasonable variations therefrom, (ii) is negotiated in an arms-length transaction with an independent third party tenant and (iii) provides for rental rates and terms comparable to existing local market terms. All Leases entered into after the date hereof shall provide that they are subordinate to this Security Instrument and that the lessee agrees to attorn to Lender. Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Obligations; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; Borrower may terminate, however, Minor Leases as the result of a default by lessee thereunder; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall not alter, modify or change the terms of the Leases without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), except that Borrower may alter, modify or change the terms of a Minor Lease provided such alteration, modification or change does not (A) decrease the amount of rent payable under such Lease, (B) change the payment date of rents due under such Lease, (C) release any party from responsibility under such Lease, or (D) increase landlord's or decrease tenant's obligations under such Lease; (vii) shall not cancel or terminate the Leases or accept a surrender thereof without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), except that a Minor Lease may be cancelled (or Borrower may accept a surrender thereof), provided a new Lease with respect to the leased premises is entered into on substantially the same terms or more favorable economic terms as the cancelled or surrendered Lease with a tenant with the same or better credit as the tenant under the cancelled or surrendered lease; (viii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Land or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder without the prior written consent of Lender; (ix) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to the Leases (the "Lease Guaranty") or cancel or terminate such Lease Guaranty without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), except that a Lease Guaranty in respect of a Minor Lease may be (A) altered, modified or changed provided such alteration, modification or change does not decrease the economic benefit of such Lease Guaranty, or (B) cancelled or terminated, provided a substitute guaranty is delivered from a guarantor with the same or better credit as the guarantor under the cancelled or terminated Lease Guaranty; and (x) shall not consent to any assignment of or subletting under the Leases not in accordance with their terms, without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), except that Borrower may consent to an assignment or subletting under a Minor Lease provided the assignor thereunder remains primarily liable under

-8-

such Lease. Any failure of Lender to respond to Borrower's written request for consent pursuant to this Section 3.6(a) within five (5) business days of the date of Lender's receipt of all information required by Lender in connection with its review of such Lease shall be deemed to constitute Lender's consent, provided that (i) such request by Borrower is made in accordance with the notice provisions of Section 14.1 of this Security Instrument, and (ii) such request by Borrower states prominently in bold capital letters on the face there of: **"IF CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED PARTNERSHIP DOES NOT RECEIVE A RESPONSE FROM LENDER TO THIS REQUEST FOR CONSENT WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT BY LENDER OF ALL REQUIRED INFORMATION, THE REQUEST REFERRED TO HEREIN SHALL BE DEEMED APPROVED."**

(b)     Notwithstanding the provisions of Subsection 3.6(a) above, renewals of existing commercial Leases and proposed leases for commercial space shall not be subject to the prior approval of Lender provided all of the following conditions are satisfied: (i) the rental income pursuant to the renewal Lease or proposed lease is not more than twenty-five percent (25%) of the total rental income for the in-line stores, (ii) the renewal Lease or proposed lease covers less than twenty-five percent (25%) of the in-line store space, in the aggregate, and (iii) the renewal Lease or proposed lease covers less than twenty percent (20%) of the total net rentable space in the Property, in the aggregate ((i), (ii) and (iii), "Minor Leases"), (iv) the renewal Lease or proposed lease shall have a lease term not to exceed ten (10) years including options to renew, (v) the renewal Lease or proposed lease shall provide for rental rates and terms comparable to existing local market rates and terms, and (vi) the renewal Lease or proposed lease shall be an arms-length transaction with a bona fide, independent third party tenant. Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within thirty (30) days after the execution of the Lease.

(c)     Intentionally deleted.

(d)     All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

3.7   <u>MAINTENANCE OF PROPERTY</u>. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property and tenant improvements made in connection with a Lease which has been entered into by Borrower in accordance with the terms hereof) without the consent of Lender. Subject to the provisions of Subsection 3.2(g) and Section 3.5, Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 3.5 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

3.8   <u>WASTE</u>. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of

the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument.

3.9 COMPLIANCE WITH LAWS.  Borrower shall (i) promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, or the use thereof including, but not limited to, the Americans with Disabilities Act ("ADA") (collectively, the "Applicable Laws"), (ii) from time to time, upon Lender's request (but not more than once per calendar year, except in connection with the issuance of Securities in connection with the Loan), execute and deliver to Lender a certificate (or other evidence satisfactory to Lender) that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws, (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws, and (iv) take appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.

3.10 BOOKS AND RECORDS.  (a) Borrower shall keep adequate books and records of account in accordance with methods of accounting reasonably acceptable to Lender and furnish to Lender:

(i)        quarterly operating statements of the Property, prepared and certified by Borrower in the form reasonably required by Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for that quarter, containing appropriate year to date information, and containing a comparison for such quarter with the annual budget delivered pursuant to Subsection 3.10(a)(v), within forty-five (45) days after the end of each fiscal quarter;

(ii)       certified rent rolls for the last month of each fiscal quarter signed and dated by Borrower, detailing the names of all tenants of the Improvements, the portion of Improvements occupied by each tenant, the base rent and any other charges payable under each Lease and the term of each Lease, including the expiration date, and any other information as is reasonably required by Lender, within forty-five (45) days after the end of each fiscal quarter;

(iii)      an annual operating statement of the Property detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, and containing a comparison for such period with the annual budget delivered pursuant to Subsection 3.10(a)(v), to be prepared and certified by Borrower in the form reasonably required by Lender, within one hundred twenty (120) days after the close of each fiscal year of Borrower and if available, any operating statements prepared by an independent certified public accountant within thirty (30) days of the date the same are made available to Borrower;

(iv)      an annual balance sheet and profit and loss statement of Borrower in the form reasonably required by Lender, to be prepared and certified by Borrower within one hundred twenty (120) days after the close of each fiscal year of Borrower, and, as the case may be, if available, any financial statement prepared by an independent certified public accountant with respect to Borrower within thirty (30) days of the date the same are made available to any such persons;

(v)       within fifteen (15) days of Lender's request, an annual operating budget presented on a monthly basis consistent with the quarterly and annual operating statements described above for the Property, including cash flow projections for the current or upcoming year, and all proposed capital replacements and improvements;

-10-

    (vi)  copies of Borrower's federal income tax returns within fifteen (15) days of the date such returns are filed; and

    (vii)  within thirty (30) days of the end of each quarter, a certificate of Borrower indicating Borrower's determination of NOI (hereinafter defined), Expenses (hereinafter defined) and Debt Service Coverage Ratio (hereinafter defined), which certificate shall include detailed information supporting Borrower's determination of each of the foregoing. Borrower acknowledges and agrees that its determination of the foregoing shall not be binding on Lender.

    (b)  Upon Lender's request, Borrower shall cause each Guarantor (as hereinafter defined) and each Indemnitor other than Borrower (an "Indemnitor") under the Environmental Indemnity (as hereinafter defined) to furnish to Lender no later than one hundred twenty (120) days after the end of the fiscal year for the applicable Guarantor or Indemnitor a financial statement for said fiscal year certified to Lender and prepared on a form reasonably acceptable to Lender.

    (c)  Borrower, its affiliates, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information as may, from time to time, be reasonably required by Lender in form and substance reasonably satisfactory to Lender.

    3.11 <u>PAYMENT FOR LABOR AND MATERIALS</u>. Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

    3.12 <u>MANAGEMENT</u>. If the Debt Service Coverage Ratio (as hereinafter defined) shall fall below 1.0:1.0 while the Property is being managed by a third party not affiliated with Borrower, then Lender, at its option, may require Borrower to engage another bona-fide, independent third party management agent approved by Lender in its sole discretion (the "New Manager") to manage the Property. The New Manager shall be engaged by Borrower pursuant to a written management agreement that complies with the terms hereof and is otherwise satisfactory to Lender in all respects.

    3.13 <u>PERFORMANCE OF OTHER AGREEMENTS</u>. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an obligation secured hereby and any amendments, modifications or changes thereto.

    3.14 <u>CHANGE OF NAME, IDENTITY OR STRUCTURE</u>. Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, limited liability company, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender. Borrower will execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein, and to the extent permitted by applicable law, hereby authorizes Lender to file any such financing statement on Borrower's behalf. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

    3.15 <u>EXISTENCE</u>. Borrower will continuously maintain its existence and its rights to do business in the state where the Property is located together with its franchises and trade names.

-11-

3.16 <u>OFAC</u>. At all times throughout the term of the Loan, Borrower and all of its respective Affiliates shall (i) not be a Prohibited Person (defined below) and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

The term "Prohibited Person" shall mean any person or entity;

(a)     listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

(b)     that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order.

(c)     with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)     that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, www.ustreas.gov/offices/enforcement/ofac or at any replacement website or other replacement official publication of such list; or

(f)     who is an Affiliate of or affiliated with a person or entity listed above.

The term "Affiliate", as used herein, shall mean, as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

## 4. SPECIAL COVENANTS

Borrower covenants and agrees that:

4.1 <u>PROPERTY USE</u>. The Property shall be used only as a retail shopping center, and for no other use without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.

4.2 <u>SINGLE PURPOSE ENTITY</u>. It has not and shall not: (a) engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto; (b) acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property;  (c) merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's consent; (d) fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of Borrower's partnership agreement, articles or certificate of incorporation, articles

-12-

of organization, operating agreement, or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations hereunder, under the Note or under the other Loan Documents; (e) own any subsidiary or make any investment in, any person or entity without the consent of Lender; (f) commingle its assets with the assets of any of its general partners, managing members, shareholders, affiliates, principals or of any other person or entity; (g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt, except with respect to trade payables incurred in the ordinary course of its business of owning and operating the Property, provided that such debt is paid when due; (h) fail to maintain its records, books of account and bank accounts separate and apart from those of the general partners, managing members, shareholders, principals and affiliates of Borrower, the affiliates of a general partner or managing member of Borrower, and any other person or entity; (i) enter into any contract or agreement with any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof, except upon terms and conditions that are comparable to those that would be available on an arms-length basis with third parties other than any general partner, managing member, shareholder, principal or affiliate of Borrower, Guarantor or Indemnitor, or any general partner, managing member, shareholder, principal or affiliate thereof; (j) seek the dissolution or winding up in whole, or in part, of Borrower; (k) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof or any other person; (l) hold itself out to be responsible for the debts of another person; (m) make any loans to any third party; (n) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or affiliate of Borrower, or any general partner, managing member, shareholder, principal or affiliate thereof); (o) intentionally deleted; or (p) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

The covenants set forth in (a) through (p) above shall apply to the general partner of Borrower (the "Controlling Party") provided that all references to "Property" set forth above shall, with respect to the Controlling Party, be deemed to refer to its general partnership interest in Borrower. Without limitation to the foregoing provisions of this Section 4.2, Borrower and the Controlling Party will not amend and will not permit any other person or entity to amend the provisions of Article IX of the articles of incorporation or Article VII(l) of the By-Laws of the Controlling Party or Sections 2.5 and 2.11 of Borrower's limited partnership agreement.

Notwithstanding anything to the contrary contained in this Section 4.2, Borrower is permitted to incur unsecured debt provided such debt (i) is owed solely to partners or members (as applicable) of Borrower, (ii) is not secured by any assets owned by Borrower, (iii) is incurred solely for the purpose of funding operating expense shortfalls, (iv) shall not render Borrower insolvent, and (v) is fully subordinated to the Debt as evidenced by such partner's or member's delivery to Lender of a fully executed subordination and standstill agreement in the form of Exhibit D attached hereto and made a part hereof prior to incurring such indebtedness. As used herein, the term "insolvent" shall mean that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all of such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

4.3 RESTORATION. The following provisions shall apply in connection with the Restoration of the Property:

(a)     If the Net Proceeds shall be less than $250,000 and the costs of completing the Restoration shall be less than $250,000, the Net Proceeds will be disbursed by Lender to Borrower upon receipt,

-13-

SSL-DOCS1 1537917v2

provided that Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Security Instrument.

(b)      If the Net Proceeds are equal to or greater than $250,000, or the costs of completing the Restoration is equal to or greater than $250,000, Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Subsection 4.3(b). The term "Net Proceeds" for purposes of this Section 4.3 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Subsections 3.2(a)(i), (iv), (vi) and (viii) of this Security Instrument as a result of such damage or destruction (or any proceeds of self-insurance maintained in lieu of such insurance policies), after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Insurance Proceeds"), or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 3.5 of this Security Instrument, after deduction of its reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same ("Condemnation Proceeds"), whichever the case may be.

(i)      The Net Proceeds shall be made available to Borrower for the Restoration provided that each of the following conditions are met: (A) no Event of Default shall have occurred and be continuing under the Note, this Security Instrument or any of the other Loan Documents; (B) (1) in the event of the Net Proceeds are Insurance Proceeds, less than fifty percent (50%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, as of the date of the completion of the Restoration, the ratio of the outstanding principal balance of the Note to the current fair market value of the Property, as determined by a full narrative appraisal, commissioned by Lender at Borrower's sole cost and expense, shall be no greater than .80 to 1.00; (C) Leases demising in the aggregate a percentage amount equal to or greater than fifty percent (50%) (with respect to casualties) or ninety percent (90%) (with respect to condemnation) of the total net rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such fire or other casualty, as the case may be, shall remain in full force and effect during and after the completion of the Restoration and Borrower shall have furnished to Lender evidence satisfactory to Lender that bw-3, d/b/a Buffalo Wild Wings and Breads of the World, L.L.C. d/b/a St. Louis Bread and/or Panera Bread, or any replacement tenant(s) thereof, shall continue to lease and operate their respective premises at the Property notwithstanding the occurrence of any such fire or other casualty or taking, whichever the case may be, and will make all necessary repairs and restorations thereto at their sole cost and expense; (D) Borrower shall have commenced the Restoration as soon as reasonably practicable (but in no event later than one hundred eighty (180) days after such damage or destruction or taking, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion; (E) Lender shall be reasonably satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note at the Applicable Interest Rate (as defined in the Note), which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Subsection 3.2(a)(iii), if applicable, or (3) by other funds of Borrower; (F) Lender shall be reasonably satisfied that following the completion of the Restoration, the ratio of sustainable net cash flow for the Property (after deduction for underwritten reserves) to debt service payable under the Note shall be at least 1.20 to 1.00; (G) Lender shall be reasonably satisfied that the Restoration will be completed on or before the earliest to occur of (1) twelve (12) months prior to the Maturity Date (as defined in the Note), (2) fifteen (15) months after the occurrence of such fire or other casualty or taking, whichever the case may be, (3) the earliest date required for such completion under the terms of any Leases which are required in accordance with the provisions of this Subsection 4.3(b) to remain in effect subsequent to the occurrence of such fire or other casualty or taking, whichever the case may be, and the completion of the Restoration or (4) such time as may be required under any applicable zoning laws, ordinances, rules or regulations in order to repair and restore the Property to the condition it was in immediately prior to such fire or other casualty or to as nearly as possible the condition it was in immediately prior to such taking, as applicable; (H) the

-14-

SSL-DOCS1 1537917v2

Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable zoning laws, ordinances, rules and regulations; (I) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable laws, rules and regulations; and (J) such fire or other casualty or taking, as applicable, does not result in the loss of access to the Property or the Improvements.

(ii)     The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Subsection 4.3(b), shall constitute additional security for the Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the reasonable satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company insuring the lien of this Security Instrument.

(iii)     All plans and specifications required in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and by an independent consulting engineer selected by Lender (the "Casualty Consultant"), which approval shall not be unreasonably withheld or delayed. Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration.  The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant, which approval shall not be unreasonably withheld or delayed.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "Casualty Retainage" as used in this Subsection 4.3(b) shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Subsection 4.3(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company insuring the lien of this Security Instrument.  If required by Lender, the release of any such portion of the Casualty

-15-

Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Subsection 4.3(b) shall constitute additional security for the Obligations.  With respect to Restorations following a casualty in which the Improvements are restored to substantially the same condition as they existed prior to the casualty, the excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Subsection 4.3(b), and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under the Note, this Security Instrument or any of the other Loan Documents.

(c)     All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Subsection 4.3(b)(vi) may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion.  Provided no Event of Default exists under the Note, this Security Instrument or the other Loan Documents, Borrower shall not be obligated to pay any prepayment premium or other prepayment consideration in connection with a prepayment resulting from the application of Net Proceeds to the Debt pursuant to the preceding sentence.  Any such prepayment shall be applied to the principal last due under the Note and shall not release Borrower from the obligation to pay the "Constant Monthly Payments" due under Note A and Note B, and such Constant Monthly Payments shall not be adjusted or recalculated as a result of such partial prepayment.  If Lender shall receive and retain Net Proceeds, the lien of this Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)     Intentionally deleted.

4.4  LOCK-BOX ACCOUNT.  (a) Upon the occurrence of an Event of Default, Lender shall have the right, upon written notice to Borrower to require that, from and after the next succeeding date of payment of an installment of principal and interest under the Note, all Rents with respect to the Property, at Lender's discretion, be paid directly to the property manager for the Property (the "Manager") and deposited daily by the Manager in the name designated by Lender directly to a designated lock-box account (the "Lock-Box Account"), opened by Lender at a bank (the "Lock-Box Bank"), which account shall be within the exclusive control of Lender.

(b)     Upon receipt of a notice from Lender as set forth in Subsection (a) above, Borrower shall enter into and shall cause Manager to enter into a lock-box agreement with Lender in a form reasonably satisfactory to Lender, which form shall substantially reflect the provisions of this Section (provided, however, that Borrower's obligations under this Section 4.4 shall not be dependent upon the execution of any such lock-box

-16-

agreement). If, in Lender's reasonable judgment, the Manager's performance in collecting Rents shall decline, Borrower shall irrevocably instruct and otherwise cause each party paying such Rents (including each tenant under any Lease) to make all payments (A) if by wire transfer, to the Lock-Box Account, and (B) if by check, money order or similar manner of payment, by mail to a designated lock box (the "Lock-Box") within the exclusive control of Lender. Amounts deposited into the Lock-Box shall be collected and deposited daily by the Lock-Box Bank into the Lock-Box Account. Borrower agrees that if any Rents required to be deposited in the Lock-Box Account shall be received by it or any affiliate or any manager of all or any portion of the Property, Borrower shall deposit or cause such Rents to be deposited in the Lock-Box Account within one (1) Business Day of the receipt of such Rents by Borrower, any affiliate or any manager.

(c)     Amounts on deposit in the Lock-Box Account on any date of payment of an installment of principal and interest under the Note shall be applied in the following order of priority: (i) to pay any Taxes, Other Charges or Insurance Premiums then due and payable; (ii) to pay the Lock-Box Bank's fees; (iii) to pay interest and principal due on such date with respect to the Note; (iv) to replenish all reserves and escrow funds required to be paid by Borrower to Lender under the Note, this Security Instrument and the other Loan Documents; (v) to pay normal and customary operating expenses of the Property which have been approved by Lender (which approval, if no Event of Default shall exist at the time, shall not be unreasonably withheld); and (vi) provided no Event of Default shall exist at the time, to Borrower.

(d)     If, after the occurrence of an Event of Default and the implementation of lock box procedures in accordance with this Section 4.4 or any other provision of the Loan Documents, Lender shall waive such Event of Default in accordance with the terms of this Security Instrument and the other Loan Documents, such lock box procedures shall terminate (it being agreed that upon the occurrence of a subsequent Event of Default, Lender shall have the right to re-implement lock box procedures as permitted under any other provisions of the Loan Documents).

(e)     In the event that Lender shall have the right to institute lock box procedures pursuant to any other provision of the Loan Documents, the terms and provisions of such provision shall supersede the provisions of this Section 4.4.

## 5. REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

5.1 WARRANTY OF TITLE. Borrower has paid for and has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

5.2 AUTHORITY. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

5.3 LEGAL STATUS AND AUTHORITY. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State where the Property is located; and (c) has all necessary approvals,

-17-

governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Security Instrument and the other Loan Documents.

5.4 VALIDITY OF DOCUMENTS. (a) The execution, delivery and performance of the Note, this Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby); and (b) the Note, this Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower.

5.5 LITIGATION. There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, a Guarantor, if any, an Indemnitor, if any, or the Property that has not been disclosed to Lender or is not adequately covered by insurance, as determined by Lender in its sole and absolute discretion.

5.6 STATUS OF PROPERTY. (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in Section 3.2 hereof; (b) Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) the Property and the present and contemplated use and occupancy thereof are in full compliance with all Applicable Laws, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the ADA) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service; (f) all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public; (g) the Property is, to the best of Borrower's knowledge, free from damage caused by fire or other casualty; (h) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full; (i) all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws; and (j) all Improvements lie within the boundary of the Land.

-18-

5.7 <u>NO FOREIGN PERSON</u>.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

5.8 <u>SEPARATE TAX LOT</u>.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements are assessed and taxed together with the Property or any portion thereof.

5.9 <u>ERISA COMPLIANCE</u>.  As of the date hereof and throughout the term of this Security Instrument, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.  Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

5.10 <u>LEASES</u>. (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable; (c) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (d) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (e) none of the Rents have been collected for more than one (1) month in advance; (f) the premises demised under the Leases have been completed and the tenants under the Leases have accepted the same and have taken possession of the same on a rent-paying basis; (g) there exist no offsets or defenses to the payment of any portion of the Rents; (h) no Lease contains an option to purchase, right of first refusal to purchase, or any other similar provision; and (i) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease.

5.11 <u>FINANCIAL CONDITION</u>. (a) Borrower is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated, and (b) it has received reasonably equivalent value for the granting of this Security Instrument.

5.12 <u>BUSINESS PURPOSES</u>.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

5.13 <u>TAXES</u>.  Borrower has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

5.14 <u>MAILING ADDRESS</u>.  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

5.15 <u>NO CHANGE IN FACTS OR CIRCUMSTANCES</u>.  All information submitted in connection with Borrower's application for the loan and Lender's issuance of a commitment for the Loan (collectively, the "Loan Application") and the satisfaction of the conditions thereof, including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents, are accurate, complete and correct in all respects.  There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

-19-

5.16 <u>DISCLOSURE</u>.  To Borrower's best knowledge, Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

5.17 <u>THIRD PARTY REPRESENTATIONS</u>.  Each of the representations and the warranties made by each Guarantor and Indemnitor herein or in any other Loan Document(s) is true and correct in all material respects.

5.18 <u>ILLEGAL ACTIVITY</u>.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

5.19 <u>OFAC</u>.  Borrower represents and warrants that neither Borrower or any of its respective Affiliates is a Prohibited Person and Borrower and all of its respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

5.20 <u>PROPERTY DOCUMENTS</u>.  (a) To Borrower's best knowledge, neither Borrower, nor, to Borrower's actual knowledge, any other party, is currently in default (nor has any notice been given or received with respect to an alleged or current default) under any of the terms and conditions of any Property Document (as hereinafter defined), and any such Property Document remains unmodified and in full force and effect; (b) to the best of Borrower's knowledge, all easements granted pursuant to any Property Document, which was to have survived the site preparation and completion of construction (to the extent that the same has been completed), remains in full force and effect and has not been released, terminated, extinguished or discharged by agreement or otherwise; (c) to the best of Borrower's knowledge, all sums due and owing by Borrower to the other parties to any Property Document (or by the other parties to such Property Document to Borrower) pursuant to the terms of such Property Document, including without limitation, all sums, charges, fees, assessments, costs, and expenses in connection with any taxes, site preparation and construction, non-shareholder contributions, and common area and other property management activities have been paid, are current, and no lien has attached on the Property (or threat thereof been made) for failure to pay any of the foregoing; and (d) to Borrower's actual knowledge, the terms, conditions, covenants, uses and restrictions contained in any Property Document do not conflict in any manner with any terms, conditions, covenants, uses and restrictions contained in any Lease or in any agreement between Borrower and occupant of any peripheral parcel, including without limitation, conditions and restrictions with respect to kiosk placement, tenant restrictions (type, location or exclusivity), sale of certain goods or services, and/or other use restrictions.

As used herein, the term "Property Document" shall mean any ground lease, grant of easement or rights-of-way, reciprocal easement agreement, declaration of covenants, conditions and restrictions, development agreement, planned unit development agreement, franchise agreement, license, permit or variance, parking agreement or any other instrument to which Borrower and an adjoining landowner, adjoining leaseholder or a governmental agency are a party, which instrument creates obligations on the part of Borrower or bestows rights upon Borrower with respect to the ownership, operation, management or leasing of the Property.

Borrower acknowledges that in accepting the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth above notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in making the Loan and that Lender would not make the Loan in the absence of such warranties.

SSL-DOCS1 1537917v2

## 6. OBLIGATIONS AND RELIANCES

6.1 RELATIONSHIP OF BORROWER AND LENDER. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower and no term or condition of any of the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor. Borrower is not relying on Lender's expertise business acumen or advice in connection with the Property.

6.2 NO LENDER OBLIGATIONS. (a) Notwithstanding the provisions of Subsections 1.1(f) and (l) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)       By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the other Loan Documents, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

## 7. FURTHER ASSURANCES

7.1 RECORDING OF SECURITY INSTRUMENT, ETC. Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Except where prohibited by law, Borrower will pay all taxes, duties, imposts, assessments, filing, registration and recording fees, and any and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Loan Documents and any amendment or supplement thereto.

7.2 FURTHER ACTS, ETC. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, deeds to secure debt and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Applicable Laws. Borrower, on demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, and to file in the appropriate filing or recording offices, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of (i) filing any financing statements and (ii) for the purpose of exercising and perfecting any and all other rights and remedies available to Lender at law and in equity, including without limitation all other rights and remedies available to Lender pursuant to this Section 7.2, provided that the power of attorney provided for in this clause (ii) may only be exercised if Borrower has failed to take any action reasonably required of it within ten (10) days of Lender's notice and demand therefor.

-21-

7.3 <u>CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS</u>. (a) If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable and such shall not be a Default Repayment (as defined in the Note).

(b)      Borrower will not claim or demand or be entitled to any credit or credits against the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable and such shall not be a Default Repayment (as defined in the Note).

(c)      If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

7.4 <u>ESTOPPEL CERTIFICATES</u>.  (a) After request by Lender, Borrower, within ten (10) business days, shall furnish Lender or any proposed assignee an estoppel certificate in form and content as may be reasonably requested by Lender with respect to the status of the Loan and/or the Loan Documents.

(b)      Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more commercial lessees as required by Lender attesting to such facts regarding the Lease as Lender may reasonably require, <u>provided that</u> (i) Borrower shall not be required to honor more than two requests made by Lender in any twelve month period and (ii) in no event shall Borrower be required to obtain estoppel certificates from lessees containing more information than that required to be certified pursuant to the terms of the related Lease.

7.5 <u>REPLACEMENT DOCUMENTS</u>.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## 8. DUE ON SALE/ENCUMBRANCE

8.1 <u>LENDER RELIANCE</u>.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, managing members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for payment and performance of the Obligations.  Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the payment or the performance of the Obligations, Lender can recover the Debt by a sale of the Property.

8.2 <u>NO SALE/ENCUMBRANCE</u>.  Borrower agrees that Borrower shall not, without the prior written consent of Lender, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer

-22-

the Property or any part thereof or permit the Property or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred.

8.3 SALE/ENCUMBRANCE DEFINED. (a) A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Article 8 shall be deemed to include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower or any general partner or managing member of Borrower is a corporation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock by which an aggregate of more than 49% of such corporation's stock shall become vested in another party; (iv) if Borrower or any general partner or managing member of Borrower is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or managing partner, or the transfer or pledge of the partnership interest of any general partner or managing partner of such partnership or any profits or proceeds relating to such partnership interest or the transfer or pledge of more than 49% in the aggregate of any limited partnership interests in such partnership or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; (v) if Borrower or any general partner or managing member of Borrower is a limited liability company, the change, removal or resignation of the managing member of such company, or the transfer or pledge of the membership interest of the managing member of such company or any profits or proceeds relating to such membership interest or the transfer or pledge of more than 49% in the aggregate of any membership interests in such company or any profits or proceeds related to such interests whether in one transfer or pledge or a series of transfers or pledges; and (vi) without limitation to the foregoing, any voluntary or involuntary sale, transfer, conveyance or pledge by any person or entity which directly or indirectly controls Borrower (by operation of law or otherwise) (a "Principal") of its direct or indirect controlling interest in Borrower. Notwithstanding the foregoing, the following transfers shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer within the meaning of this Article 8: (A) a transfer by devise or descent or by operation of law upon the death of a partner, member or stockholder of Borrower, any Guarantor or Indemnitor or any general partner thereof or any Principal; (B) a sale, transfer or hypothecation of a partnership, shareholder or membership interest in Borrower, by a current partner, shareholder or member to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of such partner, shareholder or member or to a Principal (or a trust for the benefit of any such persons) or to a general partner or managing member of Borrower; and (C) a transfer of a partnership, shareholder or membership interest(s) in Borrower, by a current partner(s), member(s) or stockholder(s) to an entity wholly owned by such partner(s), member(s) or stockholder(s). Notwithstanding anything contained herein to the contrary, unless otherwise approved by Lender in writing, Malcolm Glazer and/or members of his immediate family shall at all times directly or indirectly control Borrower and own at least fifty one percent (51%) of the equity interests in Borrower.

(b) Notwithstanding anything to the contrary contained in this Article 8, and in addition to the transfers permitted hereunder, following the sale of the Loan in a securitization, Lender's consent to a sale of the Property will not be unreasonably withheld after consideration of all relevant factors, provided that:

(i) Lender receives thirty (30) days prior written notice of such transfer hereunder;

(ii) No Event of Default or event which with the giving of notice or the passage of time or both would constitute an Event of Default shall have occurred and remain uncured;

(iii) The proposed transferee (the "Transferee") shall be a reputable entity or person of good character, creditworthiness, with sufficient financial worth considering the obligations assumed and

-23-

undertaken, as evidenced by financial statements and other information reasonably requested by Lender, and the Transferee must be able to satisfy all the covenants of Sections 4.2 and 5.9 hereof;

(iv)    The Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Property, and Lender shall be provided with reasonable evidence thereof (and Lender reserves the right to approve the Transferee without approving the substitution of the property manager);

(v)    Lender shall have received a non-consolidation opinion and confirmation in writing from the Rating Agencies (as hereinafter defined in Section 16.1) to the effect that such transfer will not result in a re-qualification, reduction or withdrawal of any rating initially assigned or to be assigned by such Rating Agencies to any class of Securities (as hereinafter defined in Section 16.1);

(vi)    The Transferee shall have executed and delivered to Lender an assumption agreement in form and substance reasonably acceptable to Lender, evidencing such Transferee's agreement to abide and be bound by the terms of the Note, this Security Instrument and the other Loan Documents, together with such legal opinions and title insurance endorsements as may be reasonably requested by Lender;

(vii)    Lender shall have received an assumption fee on the date of such assumption equal to one percent (1.0%) of the outstanding principal balance of the Loan, plus the payment of, or reimbursement for, all reasonable costs and expenses incurred by Lender in connection with such assumption (including, without limitation, reasonable attorney's fees and costs).  Lender may, as a condition to evaluating any requested consent hereunder, require that Borrower post a cash deposit with Lender in an amount equal to Lender's anticipated costs and expenses in evaluating any such request for consent.

8.4 LENDER'S RIGHTS.  Except for transfers made in accordance with the terms of Section 8.3(b) above, Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Note, this Security Instrument and the other Loan Documents as so modified by the proposed transferee, payment of a transfer fee of one percent (1%) of the principal balance of the Note and all of Lender's expenses incurred in connection with such transfer, the approval by Lender of the proposed transferee, the proposed transferee's continued compliance with the representations, warranties and covenants set forth in Sections 4.2 and 5.9 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property without Lender's consent.  This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property.

## 9. DEFAULT

9.1 EVENTS OF DEFAULT.  The occurrence of any one or more of the following events shall constitute an "Event of Default":  (a) if any portion of the Debt is not paid on the date the same is due or if the entire Debt is not paid on or before the Maturity Date; (b) if any of the Taxes or Other Charges is not paid prior to the date the same becomes delinquent except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument; (c) if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies thirty (30) days prior to their expiration as provided in Section 3.2(e); (d) if Borrower violates or does not comply with any of the provisions of Sections 3.6 or 4.2 or Article 8; (e) if any representation or warranty of Borrower, Indemnitor or any person guaranteeing payment or performance

-24-

of the Obligations or any portion thereof (a "Guarantor"), or any general partner, principal or beneficial owner of any of the foregoing, made herein or in the Environmental Indemnity (defined below) or any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made; (f) if (i) Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, liquidation, dissolution or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of sixty (60) days; or (iii) there shall be commenced against Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or any general partner or managing member of Borrower, or any Guarantor or Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; (g) if Borrower shall be in default beyond any applicable notice or cure period under any other mortgage, deed of trust, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument; (h) if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for local real estate taxes and assessments not then delinquent and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower has first received notice thereof; (i) if any federal tax lien is filed against the Property and same is not discharged of record within thirty (30) days after Borrower has first received notice thereof; (j) if within thirty (30) days of Lender's written demand therefor Borrower fails to provide Lender with the written certification and evidence referred to in Section 5.9 hereof or Borrower fails to comply with its obligations under Section 16.1; (k) if Borrower or any other Indemnitor shall fail to perform any of its obligations under that certain environmental indemnity agreement of even date herewith (the "Environmental Indemnity") after the expiration of applicable notice and grace periods, if any; (l) if any default beyond any applicable notice or cure period occurs under any guaranty or indemnity executed in connection herewith and such default continues after the expiration of applicable grace periods, if any; or (m) if for more than ten (10) days after written notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the other Loan Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after written notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of ninety (90) days.

Notwithstanding anything to the contrary contained herein, with respect to only Borrower's first two failures in any calendar year to make a monthly debt service payment that is due under Note A or Note B within the time required under Note A or Note B (as applicable), no Event of Default shall be deemed to have occurred unless Borrower fails to make payment on or before the date that is five (5) days after Lender delivers written notice of Borrower's breach to Borrower.

-25-

## 10. RIGHTS AND REMEDIES

10.1 <u>REMEDIES</u>.  Upon the occurrence of any Event of Default, Borrower agrees that, subject to the terms of Article 13 hereof, Lender may take such action, without notice or demand, as Lender deems advisable to protect and enforce Lender's rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:  (a) declare the entire unpaid Debt to be immediately due and payable; (b) with or without entry, institute proceedings, judicial or otherwise, for the complete or partial foreclosure of this Security Instrument under any applicable provision of law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, any partial foreclosure to be subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority; (c) sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale, judicial decree or otherwise, at one or more sales, as an entirety or in one or more parcels; (d) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the other Loan Documents; (e) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents; (f) apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt; (g) enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may exercise all rights and powers of Borrower with respect to the Property including, without limitation, (1) the right to use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (2) the right to make or complete any construction, alterations, additions, renewals, replacements and improvements to or on the Property as Lender deems advisable; (3) the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (h) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (i) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise;  (j) apply the receipts from the Property, any Deposits and interest thereon and/or any unearned Insurance Premiums paid to Lender upon the surrender of any Policies maintained pursuant to Article 3 hereof (it being agreed that Lender shall have the right to surrender such Policies upon the occurrence of an Event of Default), to the payment of the Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion; (k) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing:  the right to (1) take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (2) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender; or (l) require a Lock-Box Account pursuant to Section 4.4 and apply all sums in the Lock-Box Account to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its discretion.  Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower.  Upon any foreclosure or other sale of the Property pursuant to the terms hereof, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the secured indebtedness as a credit against the purchase price.

-26-

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority. Notwithstanding the provisions of this Section 10.1 to the contrary, if any Event of Default as described in clause (i) or (ii) of Subsection 9.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

10.2 <u>APPLICATION OF PROCEEDS</u>.  The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

10.3 <u>RIGHT TO CURE DEFAULTS</u>. Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder or curing or being deemed to have cured any default hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 10.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate (as defined in the Note), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

10.4 <u>ACTIONS AND PROCEEDINGS</u>. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its reasonable discretion, decides should be brought to protect its interest in the Property.

10.5 <u>RECOVERY OF SUMS REQUIRED TO BE PAID</u>.  Subject to Article 13, Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

10.6 <u>EXAMINATION OF BOOKS AND RECORDS</u>.  Lender, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Borrower or of any Guarantor or Indemnitor which reflect upon their financial condition, at the Property or at any office regularly maintained by Borrower or any Guarantor or Indemnitor where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower or of any Guarantor or Indemnitor pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower or any Guarantor or Indemnitor where the books and records are located. This Section 10.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing. Notwithstanding anything to the contrary contained herein, Lender shall provide Borrower with reasonable prior written notice before conducting its examination as described above.

-27-

10.7 <u>OTHER RIGHTS, ETC.</u>  (a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)  It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)  Lender may resort for the payment of the Debt to any other security for the debt held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

10.8 <u>RIGHT TO RELEASE ANY PORTION OF THE PROPERTY</u>.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

10.9 <u>INTENTIONALLY DELETED</u>.

10.10 <u>RECOURSE AND CHOICE OF REMEDIES</u>.  Notwithstanding any other provision of this Security Instrument, including but not limited to Article 13 hereof, Lender and other Indemnified Parties (defined in Section 11.1 below) are entitled to enforce the obligations of Borrower, Guarantor and Indemnitor contained in Sections 11.2 and 11.3 without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower, Guarantor and Indemnitor.  The provisions of Sections 11.2 and 11.3 are exceptions to any non-recourse or exculpation provisions in the Note, this Security Instrument or the other Loan Documents, and Borrower, Guarantor and Indemnitor are fully and personally liable for the obligations pursuant to Sections 11.2 and 11.3.  The liability of Borrower, Guarantor and Indemnitor are not limited to the original principal amount of the Note.  Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing pursuant to this Security Instrument or exercising any other rights and remedies pursuant to the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence.  Subject to Article 13 hereof, a separate action or actions may be brought and prosecuted against Borrower,

-28-

whether or not action is brought against any other person or entity or whether or not any other person or entity is joined in the action or actions.

10.11  RIGHT OF ENTRY.  Upon reasonable prior notice, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

10.12  DEFAULT INTEREST AND LATE CHARGES.  Borrower acknowledges that, without limitation to any of Lender's rights or remedies set forth in this Security Instrument, Lender has the right following an Event of Default to demand interest on the principal amount of the Note at the Default Rate and late payment charges in accordance with the terms of the Note.

## 11. INDEMNIFICATION

11.1  GENERAL INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense) (the "Losses") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following, except to the extent the following relate to an Indemnified Party's gross negligence or willful misconduct:  (a) any Event of Default; (b) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Security Instrument or the Note or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any Guarantor or Indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (c) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any use, nonuse or condition in, on or about the Property or any part thereof; (e) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Security Instrument; (f) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (g) any failure of the Property to be in compliance with any Applicable Laws; (h) the enforcement by any Indemnified Party of the provisions of this Article 11; (i) the payment of any commission, charge or brokerage fee, the claim for which arises through Borrower, to anyone which may be payable in connection with the funding of the Loan; (j) any misrepresentation made by Borrower in this Security Instrument or any other Loan Document; or (k) any other transaction arising out of or in any way connected with the Property or the Loan.  Any amounts payable to Lender by reason of the application of this Section 11.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  For purposes of this Article 11, the term "Indemnified Parties" means Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by this Security Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

11.2  MORTGAGE AND/OR INTANGIBLE TAX.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of

-29-

or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents.

11.3 ERISA INDEMNIFICATION. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Section 5.9.

11.4 DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES. Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## 12. WAIVERS

12.1 WAIVER OF COUNTERCLAIM. Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the other Loan Documents, or the Obligations. Any assignee of Lender's interest in this Security Instrument and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such rights to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

12.2 MARSHALLING AND OTHER MATTERS. Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

12.3 WAIVER OF NOTICE. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

12.4 SOLE DISCRETION OF LENDER. Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions

-30-

and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

12.5 SURVIVAL. The indemnifications made pursuant to Article 11 shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction or other termination of this Security Instrument, any assignment or other transfer of all or any portion of this Security Instrument or Lender's interest in the Property (but, in such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including but not limited to foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Note or any of the other Loan Documents, any transfer of all or any portion of the Property (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Security Instrument, the Note or the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto. Notwithstanding the foregoing, in no event shall Borrower be obligated to indemnify Lender pursuant to Article 11 hereof with respect to matters arising as the result of any event occurring after a foreclosure sale of the Property and the transfer of possession of the Property to Lender or a third party foreclosure sale purchaser.

12.6 **WAIVER OF TRIAL BY JURY. BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

## 13. EXCULPATION

13.1 EXCULPATION. Notwithstanding anything to the contrary contained herein, in the Note or in the other Loan Documents, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note or this Security Instrument by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may sell the Property under any power of sale or right of non-judicial foreclosure or bring a foreclosure action, confirmation action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon the Note, this Security Instrument, the other Loan Documents, and the interest in the Property, the Rents and any other collateral given to Lender created by the Note, this Security Instrument and the other Loan Documents; provided, however, that any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender. Lender, by accepting the Note and this Security Instrument, agrees that it shall not, except as otherwise provided in Section 10.10, sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding, under or by reason of or under or in connection with the Note, the other Loan Documents or this Security Instrument.

13.2 RESERVATION OF CERTAIN RIGHTS. The provisions of Section 13.1 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by the Note, the other Loan Documents or this Security Instrument; (b) Intentionally deleted; (c) impair the right of Lender to name Borrower as a party defendant in any action or suit for judicial foreclosure and sale under this Security Instrument; (d) affect the validity or enforceability of any indemnity, guaranty, master lease or similar instrument made in connection with the Note, this Security Instrument, or the other Loan Documents; (e) impair the right of Lender to obtain the appointment of a receiver; (f) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; (g) impair the right of Lender to obtain a deficiency judgment or judgment on the Note against Borrower if necessary to obtain any insurance proceeds or condemnation awards to which Lender would otherwise be entitled under this Security Instrument, provided, however, Lender shall only enforce such

SSL-DOCS1 1537917v2

judgment against the insurance proceeds and/or condemnation awards; or (h) impair the right of Lender to enforce the provisions of Sections 10.10, 11.2 and 11.3 of this Security Instrument.

13.3 <u>EXCEPTIONS TO EXCULPATION</u>. Notwithstanding the provisions of this Article to the contrary, Borrower shall be personally liable to Lender for the Losses it incurs due to: (i) fraud or intentional misrepresentation by Borrower, its agents or principals in connection with the execution and the delivery of the Note, this Security Instrument or the other Loan Documents; (ii) Borrower's misapplication or misappropriation of (A) Rents received by Borrower after the occurrence of an Event of Default, (B) tenant security deposits or Rents collected more than one (1) month in advance, or (C) insurance proceeds or condemnation awards relating to the Property; (iii) Borrower's failure to comply with the provisions of Section 16.1 of this Security Instrument; (iv) Borrower's or any other Indemnitor's failure to comply with the provisions of the Environmental Indemnity; or (v) Borrower's default under Sections 4.2 or 8.2 of the Security Instrument.

13.4 <u>RECOURSE</u>. Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Section 13.1 above SHALL BECOME NULL AND VOID and shall be of no further force and effect if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding against Borrower (A) which is commenced by any party controlling, controlled by or under common control with Borrower (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or any the foregoing parties) (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of this Security Instrument or any other remedial action permitted hereunder or under the Note or the other Loan Documents.

13.5 <u>BANKRUPTCY CLAIMS</u>. Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, this Security Instrument and the other Loan Documents.

## 14. <u>NOTICES</u>

14.1 <u>NOTICES</u>. All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED PARTNERSHIP<br>270 Commerce Drive<br>Rochester, NY 14623<br>Attention:    William Sondericker |
| With a copy to: | Woods, Oviatt, Gilman LLP<br>700 Crossroads Building<br>2 State Street<br>Rochester, NY 14614<br>Attention:   Mitchell Nusbaum, Esq. |

-32-

| If to Lender: | Lehman Brothers Bank, FSB |
| | 399 Park Avenue, 8th Floor |
| | New York, New York 10022 |
| | Attention:   John Herman |
| | |
| With a copy to: | Stroock & Stroock & Lavan LLP |
| | 180 Maiden Lane |
| | New York, New York  10038-4982 |
| | Attention:   William Campbell, Esq. |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## 15. APPLICABLE LAW

15.1 CHOICE OF LAW. This Security Instrument shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and the applicable laws of the United States of America.

15.2 USURY LAWS. This Security Instrument and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Security Instrument or the Note, Borrower is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under this Security Instrument and the Note shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

15.3 PROVISIONS SUBJECT TO APPLICABLE LAW. All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## 16. SECONDARY MARKET

16.1 TRANSFER OF LOAN. Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant

-33-

participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any rating agency (a "Rating Agency") rating such Securities (all of the foregoing entities collectively referred to as the "Investor") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable. Borrower, any Guarantor and any Indemnitor agree to reasonably cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section. Borrower shall also promptly furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest.

16.2  REPLACEMENT OF LOAN.  Lender may, at any time, replace the Loan or any portion thereof with a mezzanine loan. If any portion of the Loan is to be replaced with a mezzanine loan, the then current limited partners of Borrower and shareholders of Borrower's general partner shall convey their interests in Borrower to a mezzanine loan borrower (the "Mezz Borrower") that shall be a single-purpose, single-asset bankruptcy remote entity reasonably acceptable to Lender in exchange for substantially equivalent equity interests in the Mezz Borrower.  Provided Borrower's obligation to pay principal and interest with respect to the Loan taken as a whole shall not change, Borrower shall execute such amendments or supplements to the Loan Documents and Borrower's organizational documents as may be requested by Lender to effect the replacement of the Loan with a mezzanine loan.  Borrower shall not be obligated to pay any legal fees incurred by Lender in connection with any replacement of the Loan as contemplated by this Section 16.2.

16.3  RE-ALLOCATION OF LOAN.  Lender may, at any time, re-allocate portions of the Loan between the portion evidenced by Note A and the portion evidenced by Note B so long as the initial weighted average interest rate of the Loan shall not change.  Except to the extent needed to evidence such re-allocation and, subject to the preceding sentence, to change the applicable interest rate and monthly payment obligations under the Note, none of the terms of the Loan Documents shall change as a result of such re-allocation.  Borrower shall not be obligated to pay any legal fees incurred by Lender in connection with any re-allocation of the Loan as contemplated by this Section 16.3.

16.4  CONSOLIDATION OF LOAN.  In the event Lender elects to combine Note A and Note B into a single consolidated note (the "Consolidated Note") pursuant to its right to re-allocate in Section 16.3 above, then so long as such consolidation occurs prior to the sale of the Loan in a securitization, upon Borrower's request and provided Borrower shall bear the cost of any additional title insurance premium attributable to obtaining a "modification endorsement" (or, if such endorsement is not available due to Borrower's election, the cost of obtaining a new lender's title insurance policy), Lender shall extend the term of the Consolidated Note and otherwise incorporate "hyper-amortization" provisions substantially similar to the provisions contained in that certain promissory note dated November 26, 2003, executed by Portsmouth Plaza LLC in favor of Lender. Notwithstanding the foregoing, the Consolidated Note shall provide for yield maintenance and prepayment provisions substantially similar to those contained in Note A and Note B, except that the Prepayment Consideration shall be calculated through the "Anticipated Repayment Date" of the Consolidated Note.

## 17.  COSTS

17.1  PERFORMANCE AT BORROWER'S EXPENSE.  Borrower acknowledges and confirms that Lender shall be entitled to impose certain administrative processing and/or commitment fees in connection with:  (a) extensions, renewals, modifications, amendments and terminations of the Loan Documents requested by

-34-

SSL-DOCS1 1537917v2

Borrower, and (b) the release or substitution of collateral for the Loan requested by Borrower, and that Lender shall be entitled to reimbursement for its reasonable out-of-pocket costs and expenses associated with its provision of consents, waivers and approvals under the Loan Documents (the occurrence of any of the above shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, which are required by law, regulation or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, upon demand, all such fees, costs and expenses.

17.2  <u>ATTORNEY'S FEES FOR ENFORCEMENT</u>.  (a) Borrower shall pay all reasonable legal fees incurred by Lender in connection with the preparation of the Note, this Security Instrument and the other Loan Documents, and (b) Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees, incurred or paid by Lender in protecting its interest in the Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## 18. <u>DEFINITIONS</u>

18.1  <u>GENERAL DEFINITIONS</u>.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender, its servicer and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. The terms "include(s)" and "including" shall mean "include(s), without limitation" and "including, without limitation", respectively.

## 19. <u>MISCELLANEOUS PROVISIONS</u>

19.1  <u>NO ORAL CHANGE</u>.  This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

19.2  <u>LIABILITY</u>.  If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

19.3  <u>INAPPLICABLE PROVISIONS</u>.  If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

19.4  <u>HEADINGS, ETC.</u>  The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

-35-

SSL-DOCS1 1537917v2

19.5 <u>DUPLICATE ORIGINALS; COUNTERPARTS</u>.   This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

19.6 <u>NUMBER AND GENDER</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

19.7 <u>SUBROGATION</u>.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the payment and performance of the Obligations.

19.8 <u>ENTIRE AGREEMENT</u>.   The Note, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, this Security Instrument and the other Loan Documents, there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, this Security Instrument and the other Loan Documents.

20. <u>INTENTIONALLY DELETED</u>

21. <u>STATE SPECIFIC PROVISIONS</u>

21.1 <u>OPEN-END MORTGAGE MAXIMUM PRINCIPAL AMOUNT</u>.   This Security Instrument is an open-end mortgage made pursuant to Section 5301.232 of the Ohio Revised Code, and shall secure the payment of all loan advances included within the term "Debt," regardless of the time such advances are made.   The maximum amount of unpaid loan indebtedness, exclusive of interest thereon, which may be outstanding at any time and secured hereby shall be the maximum principal amount stated on the cover page of this Security Instrument. As permitted and provided in Section 5301.233 of the Ohio Revised Code, this Security Instrument shall also secure unpaid balances of advances made with respect to the Property for the payment of taxes, assessments, insurance premiums, or costs incurred for the protection of the Property and other costs which Lender is authorized by this Security Instrument to pay on Borrower's behalf, plus interest thereon, regardless of the time when such advances are made.

21.2 <u>OHIO REMEDIES</u>.  Without limitation to the other terms and provisions of this Security Instrument, Lender may, at its option, do all things provided or permitted to be done by a mortgagee under Section 1311.14 of the Ohio Revised Code and any amendment thereto, for the protection of Lender's interest in the Property.

21.3 <u>CONFLICTING PROVISIONS</u>. The provisions of this Article are intended to supplement, and not limit, the other provisions of this Security Instrument; provided, however, that in the event the provisions

-36-

of this Article contradict any other provision of this Security Instrument, the provisions of this Article shall govern.

## 22. CROSS-DEFAULT

22.1 CROSS-DEFAULT OF NOTE A AND NOTE B. An Event of Default under either Note A or Note B shall, at Lender's option, constitute an Event of Default under Note A, Note B, this Security Instrument and the other Loan Documents, as elected by Lender in its sole and absolute discretion.

22.2 DEBT SECURED. This Security Instrument and each of the Loan Documents shall secure the obligations of Borrower under Note A and Note B and the other Loan Documents delivered by Borrower.

-37-

**IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT** has been executed by Borrower as of the day and year first above written.

WITNESSES AS TO SIGNATURE:

*Laura Hundley*

Name: Laura Hundley

*Erin Joy Smith*

Name: Erin Joy Smith

Prepared by: Bijal N. Vira, Esq.
and upon recordation return to:
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention: Patrick Myers

**CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED PARTNERSHIP,**
a Delaware limited partnership

By:   CROSSWOODS COMMONS SHOPPING CENTER
      COLUMBUS, OH. GENERAL PARTNER
      CORPORATION,
      a Delaware corporation,
      its general partner

      By: _____, V.P.
         Name:   William Sondericker
         Title:   Vice President

## ACKNOWLEDGEMENT

STATE OF NEW YORK

COUNTY OF MONROE

The foregoing instrument was acknowledged before me this 4th day of April, 2005, by William Sondericker, the Vice President of CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. GENERAL PARTNER CORPORATION, a Delaware corporation, the general partner of CROSSWOODS COMMONS SHOPPING CENTER COLUMBUS, OH. LIMITED PARTNERSHIP, a Delaware limited partnership, on behalf of said partnership.

*Roseann Welch*

Notary Public

Printed Name: Roseann Welch

My Commission Expires:

8/2/05

ROSEANN WELCH
Notary Public, State of New York
Monroe County, #01WE5015859
Commission Expires Aug. 2, 2005

SSL-DOCS1 1537917v1

**EXHIBIT "A"**
(Legal Description)

Situated in the State of Ohio, County of Franklin, City of Columbus, being located in Quarter Township 2, Township 2, Range 18, United States Military Lands, and being a 4.154 acre tract out of an original 41.347 acre tract deeded to High Cross Associates, L.L.C., in Deed Volume 33944, Page B15, Recorders Office, Franklin County, Ohio, (all deed and plat reference made being to said Recorder's Office, unless otherwise noted), said 4.154 acre tract being more particularly described as follows:

Beginning FOR COMMENCEMENT at the centerline intersection of High Cross Boulevard (60' R/W) and Hutchinson Avenue (60' R/W), referenced by a PK nail found (0.08 feet North, 0.06 feet West);

Thence along the centerline of said Hutchinson Avenue, following the arc of a curve to the right, 279.54 feet, having a central angle of 32° 01' 58", a radius of 500.00 feet, and a chord bearing North 77° 09' 08" East, 275.91 feet to a PK nail found at the point of tangency;

Thence continuing along said centerline of Hutchinson Avenue, South 86° 49' 53" East, 75.31 feet to a point in said centerline;

Thence leaving said centerline of Hutchinson Avenue, North 03° 10' 07" Seconds East, 30.00 feet to 5/8" rebar set in the north right-of-way line of said Hutchinson Avenue and in the south line of said original 41.347 acre tract, and being the southwest corner of a 20.232 acre tract deeded to B&G Realty, Inc., Instrument No. 199 '708290082274, also the southeast corner of herein described 4.154 acre tract, the TRUE POINT OF BEGINNING;

Thence along the north right-of-way line of said Hutchinson Avenue and said south line of original 41.347 acre tract, North 86° 49' 53" West, 75.31 feet to a 5/8" rebar set, replacing a bent 3/4" pipe with a yellow plastic cap marked "EMH&T" found at the point of curvature;

Thence continuing along the north right-of-way line of said Hutchinson Avenue and said south line of original 41.347 acre tract, following the arc of a curve to the left 232.74 feet, having a central angle of 25° 09' 39", a radius of 530.00 feet, and a chord bearing South 80° 35' 18" West, 230.88 feet to a 5/8" rebar set at the point of reverse curvature at the intersection with the east right-of-way of High Cross Boulevard;

Thence leaving the north right-of-way line of Hutchinson Avenue, crossing said original 41.347 acre tract, along the said east right-of-way line of High Cross Boulevard; following the arc of a curve to the right 53.05 feet, having a central angle of 101° 20' 20", a radius of 30.00 feet, and a chord bearing North 61° 19' 22" West, 46.40 feet to a 5/8" rebar set at the point of curvature;

Thence continuing along the said east right-of-way line of High Cross Boulevard, following the arc of a curve to the right 41.82 feet, having a central angle of 14° 04' 49", a radius of 170.19

(Continued)

Exhibit "A" (Continued)
Page 2 of 3

feet, and a chord bearing North 03° 36' 48" West, 41.72 feet to a 5/8" rebar set, replacing a bent 3/4" pipe with a yellow plastic cap marked "EMH&T" found at the point of tangency;

Thence continuing along the said east right-of-way line of High Cross Boulevard, North 03° 26' 06" East, 210.20 feet to a 5/8" rebar set, replacing a bent 3/4" pipe with a yellow plastic cap marked "EMH&T" found;

Thence continuing along the said east right-of-way line of High Cross Boulevard, following the arc of a curve to the left 159.04 feet, having a central angle of 30° 22' 27", a radius of 300.00 feet, and a chord bearing North 11° 45' 08" West, 157.18 feet to a 3/4" pipe with a yellow plastic cap marked "EMH&T" found at the point of tangency;

Thence continuing along the said east right-of-way line of High Cross Boulevard, North 26° 56' 21" West, 150.48 feet to a point of curvature, reference by a 3/4" pipe with a yellow plastic cap marked "EMH&T" found (North 0.07 feet, West 0.09 feet);

Thence continuing along the said east right-of-way line of High Cross Boulevard, following the arc of a curve to the right 34.43 feet, having a central angle of 04° 11' 52", a radius of 470.00 feet, and a chord bearing North 24° 50' 25" West, 34.43 feet to a 5/8" rebar set in said right-of-way;

Thence leaving said right-of-way of High Cross Boulevard, crossing said 41.347 acre tract, South 86° 49' 53" East, 351.59 feet to a mag nail set in the west line of said 20.232 acre tract deeded to B&G Realty, Inc.,;

Thence along the west line of said 20.232 acre tract, South 03° 09' 54" West, 203.78 feet to a mag nail set;

Thence continuing along the west line of said 20.232 acre tract, South 86° 49' 53" East, 127.00 feet to a 1/4" diameter drill hole made in concrete walk;

Thence continuing along the west line of said 20.232 acre tract, South 03° 10' 07" West, 330.00 feet to the TRUE POINT OF BEGINNING, containing 4.154 acres.

Basis of bearings are based on the same meridian as the bearing of the centerline of Hutchinson Avenue (South 86° 49' 53" East), of record in Plat Book 62, Page 53 and Plat Book 64, Page 100.

(Continued)

Exhibit "A" (Continued)
Page 3 of 3

Together with easements appurtenant to the above described property as are established by the instrument entitled "Easements with Covenants and Restrictions Affecting Land", recorded as Instrument Number 199708290082274, among the Franklin County Records.

Together with easements established by the Sign Easement Agreement between High Cross Associates, L.L.C., and B & G Realty, Inc., dated August 29, 1997 and recorded August 29, 1997 in Instrument Number 199708290082151 of the Franklin County Records.

(End of Exhibit "A")

**EXHIBIT B**

REPLACEMENT RESERVE AND LEASING RESERVE REQUIREMENTS

1.   Defined Terms.

All capitalized terms used herein and not defined in this Security Instrument shall have the meanings set forth in Section 7 of this Exhibit B.  To the extent any Reserve Deposit is assigned the meaning "none" in the Reserve Letter, the provisions set forth in this Exhibit B specifically relating to the making or application of such Reserve Deposits shall be disregarded.

2.   Reserve Deposits.

(a)  Concurrently with the execution of this Security Instrument, Borrower shall deposit with Lender (i) the Deferred Maintenance Deposit and (ii) the Initial Leasing Account Deposit (if any).  The Deferred Maintenance Deposit shall be applied as provided in Section 4.1 of this Exhibit B.  The Initial Leasing Account Deposit shall be deposited into the Leasing Account (as defined below) and disbursed by Lender, pursuant to the terms of this Exhibit B, for the payment of Tenant Improvements and Leasing Commissions (as defined below) in conjunction with Leases (as defined below).

(b)  On each date that a regularly scheduled payment of principal or interest is due under the Note, Borrower shall be required to make a Monthly Deposit.

(c)  Lender shall deposit each Monthly Deposit, as received, in an escrow account (the "Reserve").  Out of each Monthly Deposit, the Monthly Replacement Account Deposit shall be allocated to an account (the "Replacement Account") for the payment of Replacements and the Monthly Leasing Account Deposit shall be allocated to an account (the "Leasing Account") for the payment of Tenant Improvements and Leasing Commissions (as defined below) in conjunction with Leases (as hereinafter defined).

(d)  Lender shall maintain a record of all deposits into and withdrawals from the Reserve and their allocation to the Replacement Account and the Leasing Account.  Lender or a designated representative of Lender shall have the sole right to make withdrawals from such account.

(e)  No interest shall be paid on the Deferred Maintenance Deposit.  Provided Borrower pays the account fees set forth below, the Reserve shall be held in an interest bearing account.  Lender shall have no responsibility or liability for the amount of interest earned on the Reserve.  All interest earned on funds in the Reserve shall be added to and become part of the Reserve, shall be allocated pro rata to the Replacement Account and the Leasing Account, and shall be for the benefit of Borrower, subject to Lender's rights pursuant to the terms of this Security Instrument.  Borrower shall be required to pay a one-time set-up fee on the date hereof of $250.00.

3.   Disbursements.

(a)  Provided no Event of Default exists, Lender shall make disbursements of funds available in the Replacement Account to reimburse Borrower for Replacements.

(b)  Provided no Event of Default exists, Lender shall make disbursements of funds in the Leasing Account to reimburse Borrower for the cost of (i) tenant improvements required under any Lease (collectively, the "Tenant Improvements"); and (ii) leasing commissions incurred by Borrower in connection with any Lease, provided that (x) such leasing commissions are reasonable and customary for properties similar to the Property and the portion of the Property for which such leasing commission is due, (y) the amount of such leasing

commissions are determined pursuant to arms length transactions between Borrower and any leasing agent to which a leasing commission is due, other than leasing commissions payable to affiliates of Borrower that are based upon terms and conditions that are comparable to those that would be available on an arms-length basis with third parties, and excluding any leasing commissions which shall be due any general partner or shareholder of Borrower (but including leasing commissions to affiliates as provided above), and (z) the Tenant under the related Lease shall have taken occupancy of its entire leased premises and commenced the payment of its entire base minimum rent (collectively, "Leasing Commissions").

(c) Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 3, disburse to Borrower amounts from the Reserve necessary to reimburse Borrower for the actual costs of (i) any Leasing Commissions and (ii) any work relating to Replacements or Tenant Improvements (collectively, "Work").

(d) Each request for disbursement from the Reserve shall be in a form specified or approved by Lender, and shall be accompanied by evidence of the full performance of the obligations of the leasing agent or satisfactory completion of the Work, as the case may be, and such bills, invoices and other evidence of the incurrence of the related costs and expenses as Lender may reasonably request.

(e) Borrower shall not make a request for disbursement from the Reserve more frequently than once in any calendar month.

(f) Borrower shall not make a request for disbursement from the Reserve in an amount less than the lesser of (i) $5,000, and (ii) the total cost of the Replacement, Tenant Improvement or Leasing Commission for which the disbursement is requested.

4.   Performance of Replacements.

4.1   Deferred Maintenance.   Notwithstanding anything contained herein to the contrary, Borrower agrees to perform all of the Scheduled Repairs within one hundred twenty (120) days after the date hereof or such other period of time, if any, set forth in the Reserve Letter.  The Deferred Maintenance Deposit shall be used solely for the payment of the actual costs of the Scheduled Repairs.  Upon completion of the Scheduled Repairs in accordance with the requirements hereof, the portion of the Deferred Maintenance Deposit remaining undisbursed, if any, shall be disbursed to Borrower.  All conditions, covenants and agreements set forth herein with respect to a disbursement from the Replacement Account shall apply to the disbursements from the Deferred Maintenance Deposit.

4.2   Entry Onto Property: Inspections.   Lender may inspect the Property in connection with any Work prior to disbursing funds from the Reserve with respect thereto.  In connection with any Work that is (i) a structural repair or improvement, (ii) a replacement or repair of a major component or element of any part of the Property or (iii) Scheduled Repairs, Lender may require, at Borrower's expense, one or more inspections and/or certificates of completion by an appropriate independent, qualified professional (e.g., architect, engineer, consultant) approved by Lender.  In addition to Lender's costs and expenses, Borrower shall pay Lender a reasonable inspection fee, provided, however, such fees shall not exceed $500, in the aggregate, in any calendar year.

5.   Borrower's Records.   Borrower shall furnish such financial statements, invoices, records, papers and documents relating to the Property as Lender may reasonably require from time to time to make the determinations permitted or required to be made by Lender with respect to disbursements of the Deferred Maintenance Deposit and/or the Reserve.

-2-

6.  <u>Insufficiency of Reserve Balances, Temporary Deferral of Monthly Deposits</u>.  The insufficiency of any balance in the Reserve or the Deferred Maintenance Deposit shall not abrogate Borrower's agreement to fulfill its obligations contained in this Security Instrument.

7.  <u>Certain Defined Terms</u>.  The following terms shall have the meanings assigned to them below:

(a)  "Deferred Maintenance Deposit" means the Deferred Maintenance Deposit set forth in the Reserve Letter, if any.

(b)  "Initial Leasing Account Deposit" means the Initial Leasing Account Deposit set forth in the Reserve Letter, if any.

(c)  "Monthly Deposit" means the sum of the Monthly Leasing Account Deposit and the Monthly Replacement Account Deposit.

(d)  "Monthly Leasing Account Deposit" means the Monthly Leasing Account Deposit set forth in the Reserve Letter, if any.

(e)  "Monthly Replacement Account Deposit" means the Monthly Replacement Account Deposit set forth in the Reserve Letter. If there is no Monthly Leasing Account Deposit, the Monthly Replacement Account Deposit shall have the same meaning as the Monthly Deposit.

(f)  "Replacements" means the costs of any repairs, improvements, equipment, alterations, additions, changes, replacements and other items which, under generally accepted accounting principles, consistently applied, are properly classified as capital expenditures or capital improvements (and, in the case of multifamily projects only shall include the costs of window treatments and carpeting, blinds, equipment and appliances, and painting of the exterior of the Property), but excluding (i) costs of routine maintenance to the Property; (ii) the costs of salaries, benefits and administrative expenses related to the employment of (A) officers and executives of Borrower, and of employees of Borrower above the level of building manager, and (B) employees of Borrower at or below the level of building manager, except in the case of those costs which Borrower can demonstrate to Lender's satisfaction to be properly allocable to the work performed by such employees in connection with Replacements; (iii) the cost of any items for which Borrower is reimbursed by insurance or otherwise; (iv) the cost of any landscaping work to the Property; (v) the cost of any material additions or material alterations to the Property after the date hereof; and (vi) (except in the case of multifamily projects) the cost of any alterations, additions, changes, replacements and improvements that are made primarily in order to prepare space for occupancy by a tenant.

(g)  "Reserve" shall mean the Leasing Account and the Replacement Account.

(h)  "Reserve Deposits" shall mean the Deferred Maintenance Deposit and the Monthly Deposit.

(i)  "Reserve Letter" means a letter from Borrower to Lender of even date herewith confirming the amount of the Monthly Replacement Account Deposit, the Monthly Leasing Deposit Account Deposit (if any) and the Deferred Maintenance Deposit, if any, and the Scheduled Repairs, if any.

-3-

(j)    "Scheduled Repairs" means the Scheduled Repairs described in the Reserve Letter, if any.

SSL-DOCS1 1537917v2

## EXHIBIT C

DEBT SERVICE COVERAGE RATIO

   The term "Debt Service Coverage Ratio" shall mean the ratio of (a) the NOI (hereinafter defined) produced by the operation of the Property during the twelve (12) calendar month period immediately preceding the calculation to (b) the Annual Debt Service.

   The Term "NOI" shall mean the Gross Income (as hereinafter defined) derived from the operation of the Property, less Expenses (hereinafter defined).

   The term "Annual Debt Service" shall mean an amount equal to twelve (12) times the monthly debt service payments payable under Note A and Note B.

   The term "Gross Income" means (and includes only) Rents (as defined in the Security Instruments) and such other income, including any rent loss or business interruption insurance proceeds, laundry, parking, vending or concession income, which are actually received by Borrower or its agents or representatives. Notwithstanding the foregoing, Gross Income shall not include (a) condemnation or insurance proceeds (excluding rent or business interruption insurance proceeds); (b) any proceeds from the sale, exchange, transfer, financing or refinancing of all or any portion of the Property; (c) amounts received from tenants as a security deposit; (d) any other type of income otherwise includable in NOI but paid directly by any tenant to a person or entity other than Borrower or its agents or representatives; or (e) interest income.

   The term "Expenses" shall mean the aggregate of the following items: (a) real estate taxes, general and special assessments or similar charges; (b) sales, use and personal property taxes; (c) management fees of not less than five percent (5%) of the gross income derived from the operation of the Property and disbursements for management services whether such services are performed at the Property or off-site; (d) wages, salaries, pension costs and all fringe and other employee-related benefits and expenses, up to and including (but not above) the level of the on-site manager, engaged in the repair, operation and maintenance of the Property and service to tenants and on-site personnel engaged in audit and accounting functions performed by Borrower; (e) insurance premiums including, but not limited to, casualty, liability, rent and fidelity insurance premiums; (f) cost of all electricity, oil, gas, water, steam, HVAC and any other energy, utility or similar item and overtime services, the cost of building and cleaning supplies, and all other administrative, management, ownership, operating, advertising, marketing and maintenance expenses incurred in connection with the operation of Property; (g) cost of necessary cleaning, repair, replacement, maintenance, decoration or painting of existing improvements on the Property (including, without limitation, parking lots and roadways), of like kind and quality or such kind or quality which is necessary to maintain the Property to the same standards as competitive properties of similar size and location of the Property, together with adequate reserves for the repair and replacement of capital improvements on the Property acceptable to Lender; (h) the cost of such other maintenance materials, HVAC repairs, parts and supplies, and all equipment to be used in the ordinary course of business, which is not capitalized in accordance with generally accepted accounting principles ("GAAP"); (i) cost of leasing commissions and tenants concessions payable by Borrower pursuant to Leases in effect for the Property; (j) legal, accounting and other professional expenses incurred in connection with the Property; (k) casualty losses to the extent not reimbursed by a third party; and (l) all amounts that should be reserved, as reasonably determined by Borrower with approval by Lender in its reasonable discretion, for repair or maintenance of the Property and to maintain the value of the Property including replacement reserves in amounts not less than those required in Exhibit B of this Security Instrument. The Expenses shall be based on the above-described items actually incurred or payable on an accrual basis in accordance with GAAP by Borrower during the twelve (12) month period ending one month prior to the date on which the NOI is to be calculated (except the capital expenses and reserves set forth in subsection (g) above), with customary adjustments for items such as taxes and insurance

which accrue but are paid periodically, as adjusted by Lender to reflect projected adjustments for the subsequent twelve (12) month period beginning on the date on which the NOI is to be calculated.

Notwithstanding the foregoing, the term "Expenses" shall not include (i) depreciation, amortization or any other non-cash item of expense unless approved by Lender; (ii) interest, principal, fees, costs and expense reimbursements of Lender in administrating the Loan or exercising remedies under the Loan Documents; or (iii) any expenditure (other than leasing commissions and tenant concessions) properly treated as a capital item under GAAP and such expenditure is treated by Borrower as a capital item in Borrower's financial statements.

-2-

## EXHIBIT D

## SUBORDINATION AGREEMENT

This Subordination Agreement (this "Subordination") is made as of the _____ day of _____, _____, by _____ a _____ having its principal place of business at _____ ("Subordinate Lender"), in favor of _____, a _____, having an address at _____ ("Lender").

## RECITALS:

Subordinate Lender intends to make a loan or loans to _____ ("Borrower") in the principal amount of $ _____ pursuant to the loan documents described in Schedule A hereto.

Subordinate Lender understands that Lender has made a loan to Borrower in the total amount of [____] AND 00/100 DOLLARS ($[____].00) (the "Loan") with respect to Crosswoods Commons Shopping Center (the "Property"). The Loan is evidenced by that certain Promissory Note A ("Note A") in the amount of [____] AND 00/100 DOLLARS ($[____].00) and that certain Promissory Note B ("Note B") in the amount of [____] AND 00/100 DOLLARS ($[____].00), each dated as of _____ ___, 2005 (with Note A and Note B being hereinafter collectively referred to as "Lender's Notes"), and each secured by that certain Mortgage and Security Agreement (the "Security Instrument"), dated as of _____ ___, 2005, encumbering the Property.

1.  Definitions.  For the purposes of this Subordination, the following terms shall have the indicated meanings:

"Bankruptcy Action" shall have the meaning set forth in paragraph 3 below.

"Lender's Debt" means all principal, interest (including default interest and additional interest), late charges, fees, prepayment or defeasance costs or expenses and any other liabilities or obligations of Borrower to Lender, direct or indirect, absolute or contingent due or to become due, now existing or hereafter incurred, including without limitation, all indebtedness evidenced by Lender's Notes and any extensions or renewals thereof and shall include any amendment, extension or replacements thereof, including any refinancing of Lender's Debt, whether or not resulting in increases in principal, interest or other sums due and owing thereon, and shall include the amount of any unfunded obligations of Lender which may be added to the amount of the Lender's Notes or Security Instrument and Lender's Debt shall specifically include any interest (including default or additional interest), which may accrue after a Bankruptcy Action.

"Lender's Loan Documents" means Lender's Notes, the Security Instrument and other Loan Documents, as defined in the Security Instrument, as well as any amendments or modifications thereof contemplated by this Subordination.

"Payment in Full" or "Paid in Full" means payment in full by cash in United States Dollars of the entire amount of Lender's Debt without discount or reduction of any nature or kind including, but not limited to, all interest accruing after the commencement of any Bankruptcy Action in accordance with the terms of Lender's Notes, without regard to whether any party liable for the repayment of any portion of Lender's Debt shall be obligated for the payment of such interest.

"Permitted Subordinated Debt Payments" shall have the meaning set forth in paragraph 3 below.

SSL-DOCS1 1537917v2

"Subordinated Debt" means all principal, interest (including default and additional interest), late charges, fees, prepayment or defeasance costs or expenses and any other liabilities or obligations of Borrower to Subordinate Lender, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred.

"Subordinate Lender's Loan Documents" means the documents described in Schedule A hereto and any other documents executed by Borrower or Subordinate Lender in connection with the Subordinate Debt.

2.   Subordination and Standstill Agreement.   Subordinate Lender hereby agrees to subordinate, and does hereby subordinate, payment of any and all Subordinated Debt to Payment in Full to Lender of all of Lender's Debt.  Without limiting the foregoing, Subordinate Lender hereby agrees that it shall not (i) demand, sue for or commence any legal proceeding to collect any of the Subordinated Debt, accelerate the payment of the Subordinated Debt or commence, vote or take any action in respect of any Bankruptcy Action without Lender's prior written consent unless and until the Lender's Debt shall have been Paid in Full, (ii) receive or be entitled to receive all or any portion of the Subordinated Debt other than as provided in the Subordinate Lender's Loan Documents, (iii) receive or be entitled to receive, all or any portion of the Subordinate Debt at any time during which a default shall exist with respect to the Lender's Debt or the undersigned shall be in breach of its obligations hereunder, or (iv) accept or obtain any lien, pledge or security interest as security for the Subordinated Debt.  Notwithstanding the foregoing, however, Subordinate Lender shall be entitled to retain and to distribute to its partners, shareholders, members or other beneficial owners (as applicable) any payments made by Borrower strictly in accordance with the terms of payment presently set forth in the Subordinate Lender's Loan Documents at any time prior to the events described in clause (iii) above ("Permitted Subordinated Debt Payments").

3.   Events of Bankruptcy.   Subordinate Lender agrees that upon any distribution of the assets or readjustment of the indebtedness of Borrower, whether by reason of liquidation, composition, bankruptcy, arrangement, marshalling of assets, receivership, assignment for the benefit of creditors or any other action or proceeding, judicial or non-judicial, involving the readjustment of all or any of the Lender's Debt or the Subordinated Debt, or the application of the assets of Borrower to the payment or liquidation thereof (each of the foregoing being referred to herein as a "Bankruptcy Action"), Lender shall be entitled to receive Payment in Full of Lender's Debt prior to the payment of all or any part of the Subordinated Debt, and in order to enable Lender to enforce Lender's rights hereunder in any such action or proceeding, Lender is hereby irrevocably authorized and empowered in its discretion (in Lender's name or in the name of Subordinate Lender) to make and to present for and on behalf of Subordinate Lender such proofs of claim against Borrower on account of the Subordinated Debt as Lender may deem expedient or proper and to receive and collect any and all dividends, distributions or other payments or disbursements made thereon in whatever form the same may be paid or issued and to apply the same to the Lender's Debt.  Subordinate Lender further agrees to execute and deliver to Lender such assignments or other instruments as may be required by Lender in order to enable Lender to enforce any and all claims, and to collect any and all payments or disbursements which may be made, on account of all or any of the Subordinated Debt.

Without limitation to the rights provided to Lender in the preceding paragraph, Subordinate Lender hereby irrevocably grants Lender the right (in Lender's name or in the name of Subordinate Lender) to exercise any and all rights of Subordinate Lender in any Bankruptcy Action to make elections with respect to the Subordinated Debt including, without limitation, elections with respect to any proposed plan of reorganization.

Subordinate Lender hereby further agrees to consent to any motion made by or on behalf of Lender in any Bankruptcy Action for relief against any stay or injunction therein against collection of Lender's Debt, including, but not limited to, any motion made by or on behalf of Lender therein to lift such stay or injunction for the purposes of foreclosing the Security Instrument.

-2-

Subordinate Lender hereby irrevocably makes, constitutes and appoints Lender its attorney-in-fact with full power to appoint substitutes or a trustee to accomplish the purposes of this Section 3 (which power of attorney shall be deemed to be coupled with an interest, shall survive the voluntary or involuntary dissolution of Subordinate Lender, and shall not be affected by any disabilities or incapacity suffered by Borrower subsequent to the date hereof).

4.   Receipt of Payments.   Subordinate Lender agrees that any payments or proceeds received by Subordinate Lender in contravention of the terms and provisions of this Agreement will be deemed to be held in trust for Lender and promptly delivered to Lender.

5.   No Assignment, Modification or Participation.   So long as any of Lender's Debt remains outstanding, Subordinate Lender hereby agrees not to (i) amend or modify any provisions or the Subordinate Lender's Loan Documents, or (ii) assign, transfer, pledge or grant participations in any rights, claims or interests of any kind in or to the Subordinated Debt, without, in each case, first obtaining Lender's prior written consent.  Any such amendment, modification, transfer, assignment or pledge without Lender's consent shall be void.

6.   Subordination Continuing.   This is a continuing agreement of subordination, and Lender may continue, without notice to holders of the Subordinated Debt, to extend credit or other accommodations or benefits and loan money to or for the account of Borrower on the faith hereof until the Lender's Debt has been paid in full.  It is further understood and agreed that Lender may at any time, in Lender's discretion, amend or otherwise modify any of the terms or provisions of the Security Instrument or any other document or instrument related to the Lender's Debt, renew or extend the time of payment of all or any portion of the Lender's Debt, waive or release any collateral which may be held therefor or release any party directly or indirectly liable for payment of any portion of Lender's Debt at any time, and in furtherance thereof make and enter into any agreements Lender deems proper or desirable, without notice to or further assent from the Subordinate Lender, without in any manner impairing or affecting this Subordination or Lender's rights hereunder.

7.   Governing Law.   This Subordination shall be deemed to be governed, construed, applied and enforced in accordance with the laws of the State of New York and the applicable laws of the United States of America.

8.   No Oral Change.   This Subordination, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Subordinate Lender or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

9.   Liability.   If Subordinate Lender consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Subordination shall be binding upon an inure to the benefit of Subordinate Lender and Lender and their respective successors an assigns forever.

10.  Inapplicable Provisions.   If any term, covenant or condition of this Subordination is held to be invalid, illegal or unenforceable in any respect, this Subordination shall be construed without such provision.

11.  Headings, etc.   The headings and captions of various paragraphs of this Subordination are for convenience of reference only and are not to be construed as defining or limiting in any way the scope or intent of the provisions hereof.

12.  Duplicate Originals; Counterparts; Facsimile.   This Subordination may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Subordination may be executed in several counterparts, each of which shall be deemed an original instrument and all of which together shall constitute a single Subordination. The failure of any party hereto to execute this Subordination, or any

-3-

counterpart hereof, shall not relieve the other signatories from their obligations hereunder. A facsimile copy of an original signature shall be deemed to be an original signature.

13. <u>Number and Gender</u>. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

14. <u>Miscellaneous</u>. Whenever pursuant to this Subordination (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be exercised by Lender in its sole discretion and shall be final and conclusive.

IN WITNESS WHEREOF, Subordinate Lender has executed this Subordination as of the date and year first written above.

SUBORDINATE LENDER:

_____

By: _____
       Name:
       Title:

**[ADD ACKNOWLEDGEMENTS]**

-4-

**SCHEDULE A**

<u>[Subordinate Lender's Loan Documents]</u>

-5-